## INTERNATIONAL INDUSTRIES, Inc. v. WARREN PETROLEUM CORP. et al.

### Civ. No. 1124.

United States District Court
D. Delaware.

Feb. 27, 1951.

John H. Poe, Tulsa, Okl., and David F. Anderson and William Poole (of Southerland, Berl & Potter), Wilmington, Del., for plaintiff.

Aaron Finger (of Richards, Layton & Finger), Wilmington, Del., James E. Allison, William E. Green and Robert J. Woolsey, Tulsa, Okl., for defendants.

LEAHY, Chief Judge.

There are two defendants named in this action, Warren Petroleum Corporation and its wholly owned subsidiary, Warren Maritime Corporation, which will be referred to

as "Warren" or the defendant. Warren is charged with the use of alleged confidential information allegedly furnished to it by plaintiff. Defendant is a substantial manufacturer and marketer of liquefied petroleum gas (referred to by the parties as LPG). This commodity is delivered to the market by rail or by water. Plaintiff claims to have confidentially disclosed to defendant a novel idea for the more economical water transportation of LPG and that defendant used such information without plaintiff's consent, and without compensation. In short, plaintiff seeks equitable relief for the breach of certain trust and confidence by Warren in the appropriation of plaintiff's plans, specifications, theories and trade secrets.

Plaintiff claims it had an economic study showing costs and other factors to be considered in the water transportation of LPG; and, in addition, it had plans and specifications showing the design for the conversion of a dry cargo vessel to a seagoing vessel for the transportation of LPG—the latter being known as the "Sharp Plans". It is plaintiff's case that the economic study and the Sharp plans involve novel ideas, constituting trade secrets, which were revealed to defendant under conditions which created a relationship of confidence, and that defendant inequitably appropriated such ideas for its own use in disregard of plaintiff's property rights.

### The Views of the Parties.

For prefatory purposes, plaintiff should be permitted to state its approach to the question for decision. While minor paraphrasing has been done, this, in essence, is what plaintiff's attorney had to say at oral argument:

If the Court please, in view of the nature of the testimony and the huge amount of documentary proof, some apparent conflicts between the documentary proof and the verbal testimony of various witnesses create a confusion which is gleaned from the briefs. In order that defendant may know plaintiff's position, it may be helpful to state exactly what plaintiff claims in this law suit.

First, plaintiff claims it is the first in the field of the preparation of a design for the conversion of a dry cargo vessel to a seagoing vessel that is capable of carrying a 100% cargo of LPG, liquefied petroleum gas, as a safe and economic operation. Plaintiff does not claim it was the first in the field of abstract thinking or speculation as to how it might be done; but, plaintiff does contend, it was first in the field of doing something concrete, and it gave substance to the various abstract ideas demonstrating what could or might be done in reducing the idea to reality. Plaintiff was organized for that purpose back in 1944. It employed the best talent available to accomplish that purpose in the retention of the professional services of Mr. George Sharp, who is recognized by his associates in the profession as the top authority on ship design when it comes to a utilization of cargo space in vessels.

Second, plaintiff claims the design which was evolved is novel in that such a ship had never been designed before; and, in particular, the claimed novelty is in the manner in which plaintiff utilized vertical tanks. This design solved a problem that had never been solved before. Plaintiff believes the record is clear that every one in the industry—plaintiff claims this includes the witnesses presented by the defense in this case—recognized this as a problem to be solved.

Third, plaintiff believes that while what it did may or may not amount to invention, in the sense that the term is used in patent law, it did amount to a discovery in the sense that the term is used and distinguished from invention in the cases upon which plaintiff does rely. True, plaintiff says, some of the component parts of plaintiff's design may have been visualized by those speculating in attempting to solve the problem, still the end result as exemplified by the plans and economic report which plaintiff had prepared, was originally unknown to the public and to the industry; but what is most important, defendant and every one from whom it tried to solicit information had no such knowledge until such time as plaintiff had completed its plans and economic report, had shown them

to the Warren organization and their associates. After that, defendant constructed a vessel in accordance with plaintiff's ideas and sent that vessel on the high seas for the world to see.

Fourth, plaintiff claims defendant had been unable to achieve anything of a concrete nature toward designing such a vessel until it had seen plaintiff's plans and had received and read its economic report; it was then with the basic data portrayed thereby and such incidental information as Warren may have lifted therefrom that the job became a comparatively simple one for defendant. In short, plaintiff claims that the circumstances under which defendant obtained plaintiff's information were such that defendant was not free to tell plaintiff they (Warren and associates) did not choose to use what had been submitted to them and then proceed to do so without obligation to plaintiff.

Fifth, plaintiff claims defendant did construct a vessel which was in every respect basically similar to the design portrayed by plaintiff's design and that such use of plaintiff's design was a breach of confidence that had been reposed in defendant. In direct quotes, plaintiff says: "We believe that under the cases we are entitled to the equitable relief afforded by an injunction where they have breached the confidence that we reposed in them, as the facts show in this case, and an accounting for profits and such other damages as we may be able to prove."

Defendant's summation at argument stressed three points.

First and foremost, defendant says it took nothing from plaintiff's president, McLaughlin or his plans. Defendant's counsel stated: "When I say nothing I mean literally nothing." Defendant urges that its Natalie O. Warren was converted and designed by the naval architects Marlow and Phelps, and neither one of them ever heard of McLaughlin or his drawings until after the design of the Natalie O. Warren had been completed. In fact, defendant says, Marlow heard nothing about it until after this suit had begun and Phelps never heard anything about it until after the time suit was threatened. Second, the Natalie O. Warren neither embodies nor utilizes, in fact, any information obtained from McLaughlin or his drawings; and practically the only feature that is common to the two designs is the vertical tank arrangement. Defendant claims such tank arrangement was well known to it and its associates and to the industry in general prior to 1946. Third, defendant argues that the features of the McLaughlin plans, either separately or in combination, which plaintiff claims to have made his plans new and novel, were likewise known to the industry prior to 1946; and with the one exception of vertical tank arrangement were not, in fact, incorporated in the Natalie O. Warren. More precisely, defendant contends the documentary proofs and live witnesses establish:

(1) The Natalie O. Warren did not embody any novel feature or combination obtained from the Sharp drawings; (2) vertical installation in an LPG vessel of gas tanks protruding through the deck is not original with plaintiff but was known by defendant and others in the industry for years; (3) conversion of dry cargo vessels for transportation of LPG, including vertical installation of tanks protruding through the deck, was not unknown to defendant prior to 1946; (4) notwithstanding the combination theory advanced by plaintiff at trial, the vertical tank arrangement alone is the only claim plaintiff can make to novelty; (5) the Natalie O. Warren does not utilize any information obtained from plaintiff or the Sharp drawings; (6) plaintiff can have no trade secret attached to the idea of a 100% conversion of a dry cargo vessel for carrying LPG; (7) there can be no novelty or trade secret in an idea which is within the knowledge of other people trained or skilled in the particular field; (8) plaintiff made no disclosure to defendant in confidence; and plaintiff's meetings and disclosures to defendant preclude any obligation of Warren to plaintiff as a matter of law.

After the arguments of the parties have been stated, a chronological discussion of

the facts will point up the issues for decision.[1]

### Discussion of Facts and Law

1. Admittedly, in June, 1944, defendant was interested, as it and its associates were for some time before, in the delivery to the market of LPG, as shown by its discussions with representatives of American Republics Corporation, the parent corporation of Pennsylvania Shipyards. Defendant was interested in acquiring a tankship which might be converted for the transportation of the commodity. American Republics Corporation suggested investigation might be made of the Shell Tankers which were being used for the transportation of LPG. On June 6, 1944, American Republics Corporation wrote to Warren, in which it was stated the Pennsylvania Shipyards had advised that " * * * the modern tanker can be converted to carry butane. They would install longitudinal tanks in the center cargo space and the outer tanks could be loaded with some other product, such as oil. They state that this seems entirely feasible." Thus it appears Warren was interested in the use of tankships involving, at least, a partial conversion by the installation of longitudinal tanks. Later, in February, 1945, plaintiff met with Warren, which indicated its interest in the maritime transportation of LPG. Neither at the first meeting nor thereafter did Warren disclose to plaintiff it had made any investigation as to the type and design of a vessel to be used for such transportation. In the following July, 1945, plaintiff advised Warren that it was making a cost study and suggested defendant might give ideas as to terminal costs. Again, in October, 1945, plaintiff wrote to Warren and stated: "We hope that you will keep us currently informed of your developments, so that we may correlate our activities with yours." On October 10, 1945, plaintiff sent to defendant Warren the economic study which it had made concerning the various elements to be considered in the water transportation of LPG. Warren acknowledged this communication and stated, "The information you have given us is very interesting and of value and we are trying to work some ideas out on terminal facilities."

Prior to sending the economic report, McLaughlin, plaintiff's president, had met with a representative of defendant in Chicago on July 21, 1945, at the suggestion of defendant. At that time defendant was advised of the preliminary work which was being done for the transportation of LPG and defendant was shown a diagram indicating the location of vertical tanks.[2]

The facts are sketchy as to what occurred after the economic report was sent to defendant in October, 1945. On July 19, 1946, however, a conference occurred at the home of the president of Warren in La Jolla, California. McLaughlin was present, as was also Warren, president of Warren Petroleum Corporation, Padon, the treasurer of Warren Petroleum, Kroch, of Belgium, and an associate of plaintiff, as well as a Commander Dodge, a retired naval officer and friend of McLaughlin. Conflict and discrepancy appear in the testimony concerning what took place at this meeting on July 19, 1946. It is clear McLaughlin showed Warren and Padon the plans which had been developed by Sharp, the naval architect, at an expense which was mentioned at about $40,000. Padon thought the idea represented by plaintiff deserved investigation. Accordingly, Warren made arrangements, at defendant's expense, to send McLaughlin to New York for a conference with other representatives of Warren. It appears Warren had met with Pacific Gas Company in New York a few weeks before, on July 8, 1946, at which meeting an informal association was made between Pacific Gas

1. While formal findings of fact and conclusions of law will be filed as an Appendix to this Memorandum, the nature of the instant case is such that a discussion of the facts is necessary in order to determine the case. Thus, while the master facts are found in the formal findings, detailed facts are also found and discussed in the Memorandum proper.

2. McLaughlin's testimony shows that during the spring of 1945 he had been in conference with the George Sharp firm of naval architects in an attempt to work out plans for the conversion of a dry cargo vessel for the transportation of LPG.

Company and Warren for the acquisition of vessels for the transportation of LPG.[3]

The proposed meeting was held in New York on July 29, 1946. Those present were McLaughlin, Brennan, vice-president of Warren Petroleum, Irvine, of American Republics Corporation, and Canning, Grace and Cashen of Pacific Gas Company. The interest of Pacific Gas Company in the proposed transaction was not announced. Once again, the Sharp plans were presented, examined and explained. At one point, McLaughlin left the conference room for a period of time, leaving the plans with the other persons present. Upon his return McLaughlin was advised Warren was not interested in the subject matter of the discussion. However, Brennan of Warren suggested McLaughlin make an appointment with the naval architect, Sharp, the next day in order that there might be further discussion concerning the plans.

The facts concerning defendant's progress on its own plans for the conversion of a dry cargo vessel for the transportation of LPG take a form somewhat as follows. Prior to the July, 1946, meeting with plaintiff, Warren had been negotiating with Pacific Gas, American Republics (and its subsidiary, Pennsylvania Shipyards) for the conversion of a vessel to an LPG carrier. Defendant's testimony indicates that as early as February, 1946, they did not consider a tanker to be a suitable vessel for conversion.[4] However, on June 20, 1946, Irvine of American Republics wrote to Warren about getting aboard a butane ship in order to "get such information as they can for the purpose of designing a T–2 tanker for carrying butane and protane." Thus, it would appear defendant was considering an oil tanker. While there was some evidence as to the activity of defendant in planning a cargo unit, there is no evidence to show defendant knew how to design a dry cargo vessel to be converted into an LPG carrier prior to the disclosures of the Sharp plans.[5] After plaintiff was finally informed defendant was not interested in the Sharp plans, Pennsylvania Shipyards proceeded with drawings for the conversion of a vessel. This ship later became the Natalie O. Warren.

The record is clear as to the qualifications and competency of the Sharp firm of naval architects. Sharp himself testified as to the plans and specifications prepared by his firm for the 100% conversion of a dry cargo vessel for the water transportation of LPG. In his opinion, such plans were original. He refuted the statement that any competent naval architect could have worked out the same plans. There is the testimony of other naval architects that the basic idea behind the Sharp plans was new and novel. While portions of this testimony were that of naval architects who were associated with Sharp, such testimony was corroborated by independent naval architects, e. g., Morrell. It was his opinion conversion of a ship for the carriage of LPG was novel and had not been done previously, including the method of installing tanks, insulation features, and piping arrangements. It was his view the Sharp plans and those of the Natalie O. Warren were basically similar.[6]

3. Up to this point, plaintiff argues with some force that the California conference on July 19, 1946, shows, in sum, there was a disclosure of the Sharp plans by plaintiff to defendant; and that defendant was advised of the costs involved in the preparation of the plans.

4. This seems contradictory to the letter of June 14, 1946, when again Republics wrote to Warren that it was interested in the purchase of a vessel from the Maritime Commission, in which it was stated: "You will note that on that page I have checked in red pencil the T–2 tankers which is about the only ship that you would be interested in."

5. The "Zulver patent" was involved in the construction of the Shell Tankships. Defendant has admitted there is no issue in this case that the ship they eventually constructed—the Natalie O. Warren—was under the Zulver patent.

6. At one point, defendant argues that both the detail and totality of this ship have been known for years in the LPG industry; yet, after the construction and the putting into service of its vessel it proclaimed the novelty of its own ship

From my review of the evidentiary facts, it is obvious the Sharp plans were novel to defendant. Here, then, was disclosure under conditions which created a relationship of confidence. Defendant made use of such novel ideas for its own purposes. Defendant's contention that, although it knew of the Sharp plans, they were not used in the construction of the Natalie O. Warren, is weakened by the testimony of defendant's own witness when it was admitted by Brennan that the economic report of plaintiff was shown to the architects and engineers, who worked on the Natalie O. Warren after July, 1946.[7]

to that same industry and sought to obtain patent protection based upon its alleged novelty.

7. A selection has been made of the documentary evidence and testimony of live witnesses which support plaintiff's contention that the Warren Companies and their associates had no knowledge to design a ship, such as the Natalie O. Warren, until after they had obtained the economic studies and plans of plaintiff. For example:

| Date | |
|---|---|
| July 6, 1944 | Letter from George Irvine of American Republic to Howard Felt of Warren Petroleum Corporation states that Pennsylvania Shipyards had advised "that the modern tanker can be converted to carry butane. They would install longitudinal tanks in the center cargo space and the outer tanks could be loaded with some other product, such as oil. They state that this seems entirely feasible." (PX. 6) |
| July, 1944 | Mr. Felt testified that the above letter and plaintiff's exhibits 2, 3, 4 and 5 were the beginning of a concrete study of the problem of LPG transportation by sea by the Warren Petroleum Corporation. (R. p. 267) |
| July 6, 1945 | Date of International Industries' Vertical Tank Plans. |
| Early Oct. or late Sept. 1945 | Mr. Felt testified that he talked to Mr. McLaughlin by telephone and McLaughlin advised that he had completed his economic report. (R. p. 259–60) |
| Oct. 4, 1945 | Letter from Mr. Brennan of Warren Petroleum Corporation to Mr. McLaughlin states that Felt had told him of the above telephone conversation. And that "Glad to know that you are making progress on building the tanker. We, ourselves are working on plans for a terminal in Houston area and with people along the eastern seaboard who are interested in tanker movement of liquefied petroleum gas." Brennan asks that McLaughlin keep Warren currently informed "so that we may correlate our activities with yours." (PX. 20) |
| Oct. 10, 1945 | Mr. McLaughlin sent the economic study to Warren Petroleum Corporation and Phillips Petroleum Corporation only. (PX. 21) |
| Oct. 22, 1945 | Letter from Brennan to McLaughlin, acknowledges receipt of McLaughlin's letter of Oct. 10 and states, the information "is very interesting and of value and we are trying to work some ideas out on terminal facilities." The letter also states that, "We are not in a position as yet to definitely enter into any arrangements for financing this type of operation. * * * Will continue our studies and as soon as we have something more definite we will get in touch with you." (PX. 24) |
| June 14, 1946 | Letter from George Irvine of American Republics to W. K. Warren with, which he enclosed the Federal Register of April 23, 1946, and states, "You will note that * * * I had checked in red pencil the T–2 tankers which is about the only ship that you would be interested in." (PX. 30) |
| July 21, 1946 | Date of conference in La Jolla, California. |

2. There is no quarrel but that one's intellectual product will be protected by a court of equity in respect of a disclosure followed by a use when the same was obtained through a confidential relationship. Two theories have been evolved by the courts: (1) preventing unfair competition; and (2) unjust enrichment. As to the rule, Mr. Justice Holmes said: "The word 'property' as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. * * * If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good."[8] The problem does not involve contracts, as such, although some authorities have approached the question on the theory of implied contract. Rather, it is a question of the validity and equity of a defendant's acts in receiving in confidence, pending the formulation of a contractual relationship, a disclosure of plaintiff's product.[9] Equitable relief will not be refused simply because plaintiff's trade secret or property right was of such a nature that it might probably be discovered by an accused defendant by independent experiment. A defendant, by its own conduct, may put itself in a position where it loses the advantage of future independent experiments.[10] And, in the case at bar, there can hardly be any serious contention but

| | |
|---|---|
| July 29, 1946 | Date of conference in the Ambassador Hotel, New York City, New York. |
| Aug. 13, 1946 | Letter from George Irvine of American Republics to Warren Petroleum Corporation, attention of Mr. Brennan. States that the writer had, "Spent yesterday with Mr. Coppinger, Mr. Slade and Mr. Marlow of the Pennsylvania Shipyards at Beaumont." It further states, "We discussed quite a number of types of ships and I have ordered stowage and capacity booklet plans on the following types:". It then lists various types of ships, all of which are dry cargo vessels. Mr. Irvine then refers to a C–2 type ship and states, "It is thought that this would be ideal. They are smaller than the Liberty, but larger than the AV–1 that they have been working with." (PX. 35) |
| Aug. 13, 1946 | Letter from George Irvine, American Republics, to Warren Petroleum Corporation, states, "They (having reference to Mr. Marlow and Mr. Slade of Pennsylvania Shipyards) stated that the plans they submit can be used on any type of ship that is definitely decided on." (PX. 33). |
| Aug. 20, 1946 | Letter from George Irvine to W. K. Warren states, "Please bear in mind that the Yard has an absolutely new idea to work on that has only been developed less than three weeks ago and requires a lot of detail and preliminary work to get a definite answer from the authorities." |
| Aug. 22, 1946 | Letter George Irvine to W. K. Warren definitely recommends the C1–A as the vessel to be obtained for conversion. (PX. 40) |

8. E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 576, 61 L.Ed. 1016.

9. See Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, affirmed 7 Cir., 36 F.2d 623, and on petition for leave to apply for leave to file a bill of review, see 7 Cir., 67 F.2d 1010, 7 Cir., 87 F.2d 104, certiorari denied 301 U.S. 695, 57 S.Ct. 923, 81 L.Ed. 1350.

10. Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344.

that the economic report and the Sharp plans were trade secrets, or of such novelty that the rule applies. A trade secret may consist of any formula, patent, device, plan, or compilation of information which may be used in one's business and which gives a person an opportunity over his competitor.[11] The economic report in the case at bar is a study of the costs involved in the water transportation of LPG; its underlying contribution is to demonstrate the comparative advantage of such transportation over other methods of transportation. This report is manifestly integrated into the Sharp plans; both contemplated the conversion of vessels for maritime transportation of LPG on an economic basis. Likewise, the Sharp plans palpably constitute a trade secret. Reputable naval architects, other than Sharp, thought the plans novel.

One point must be kept in focus: the novelty and invention required in this type of case is not the same as is required for patentability. Equitable protection is given merely against breach after learning about and using another's product. The distinction between novelty for patent purposes and novelty for the purpose of a trade secret is supported by the authorities.[12] The underlying theory of the cases is that under a particular set of circumstances a relationship of confidence may arise by operation of law, even though there is no express agreement that the matters divulged will be held in confidence.[13]

After a close reading of the record in this case, I have come to the conclusion that defendant's main endeavor has been to prove that its Natalie O. Warren differed in practically all details from plaintiff's Sharp plans and that the similarity of vertical tanks was known in the industry and covered by patent protection. But, this is not a complete statement with reference

to the problem for decision. Plaintiff never argued the Sharp plans were followed or copied in detail; plaintiff does contend defendant's vessel is substantially and basically similar. Warren's architects and engineers attempt to show that the design of the Natalie O. Warren was created independently of ideas presented to defendant by plaintiff; however, there has been no documentary proof adduced to show anything had been done or any progress made on the development of a plan for the conversion of a dry cargo vessel to a vessel carrying a 100% cargo of LPG until after defendant had examined the Sharp plans. The similarity of defendant's vessel to that contemplated by plaintiff is strong proof that one was copied from the other or at least was a suggested model; and, as said by one Court, "* * * it is hardly probable that different persons should independently of each other invent devices so nearly * * * the same time." Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 924. Defendant's explanation that its project was independently developed is one which is difficult to accept in the light of all the circumstances. In the Hoeltke case, supra, the rule to be applied in the instant case was recognized. There the Court said: * * * While there was no express agreement that defendant was to hold the information so disclosed as a confidential matter and to make no use of it unless it should purchase the invention, we think that in equity and good conscience such an agreement was implied; and having obtained the disclosure under such circumstances, defendant ought not be heard to say that there was no obligation to respect the confidence thus reposed in it."

Conclusion.

After a study of the whole record in this case, weighing the evidence, accept-

11. Restatement of Torts § 757(b).

12. Restatement of Torts § 757(b). Other cases which play along the periphery of the problem are Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12; Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4; A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531.

13. "Even if there were no express agreement to hold the improvements in confidence such an agreement would be implied from the circumstances.", Miller v. Rudolph Wurlitzer Co., D.C., 48 F. Supp. 772, 774.

ing and rejecting credibility of witnesses, examining the preponderance of the probabilities, placing various questions of fact in equilibrium after resolving conflicts in the evidence, measuring the burden of persuasion which was upon plaintiff, giving credit to both plaintiff's and defendant's witnesses from their appearance on the stand, their apparent fairness, their manner, their ability to testify, their knowledge of the things to which they testified, the probability or improbability of the happening of the events to which they testified, the extent to which their testimony was corroborated or uncorroborated—after the utilization of all the techniques available to the fact-finder, I accepted the evidence I deemed most worthy of credit, and rejected that part I deemed not worthy of credit. Within the province of fact-finding, I determined whether I believed this witness or that witness in whole or in part; whether this witness or that witness was misstating facts, either intentionally or unintentionally. Then, I concluded plaintiff should be awarded the decision. The correct rule of law, as applied to the particular master facts of this case as I have found them, convinces me that plaintiff has established it is entitled to equitable relief. The proofs support the contention the economic report and the Sharp plans were trade secrets or, at least, plaintiff's proprietary interest in them should, in law and equity, be treated the same as trade secrets; disclosure was made to defendant in confidence; defendant made use of plaintiff's trade secrets in the construction of the Natalie O. Warren. Consequently, the plaintiff is entitled to equitable relief against defendant. In accordance with Rule 52, I have appended the formal findings as required.

The parties stipulated to reserve the question as to what specific relief would be available to plaintiff if successful. Accordingly, the parties will be heard on the form of decree to be entered herein, including the nature of the specific relief sought by way of injunction and provision for the method of determining loss of profits or damages.

## Appendix.

### Findings Of Fact.

1. Plaintiff is a California corporation.

2. Defendants are Delaware corporations.

3. The amount in controversy exceeds the sum of $3,000, exclusive of interest and costs.

4. Warren Maritime Corporation, one of the defendants, is the wholly owned subsidiary of Warren Petroleum Corporation, the other defendant, and defendants are in privity with each other with respect to the subject matter of this case.

5. Plaintiff prepared, owned, and had a property or proprietary right in an economic study and report showing the costs and other factors to be considered in the marine transportation of liquified petroleum gas.

6. Plaintiff had prepared by a firm of naval architects (George Sharp), owned, and had a property or proprietary right in, certain plans and specifications showing the design for the complete conversion of a dry cargo vessel to a seagoing vessel for the transportation of liquified petroleum gas.

7. Plaintiff revealed and disclosed the economic report and the Sharp plans to defendant and associates, at the request of defendant, for the purpose of negotiating a business transaction between plaintiff and defendant.

8. After plaintiff revealed and disclosed the economic report and Sharp plans to defendant, defendant had plans prepared and caused to be constructed a vessel known as the Natalie O. Warren, which vessel and the plans therefor involved the conversion of a dry cargo vessel to a vessel carrying a 100% cargo of liquified petroleum gas.

9. Defendant thereafter used and employed the Natalie O. Warren in the marine transportation of liquified petroleum gas as contemplated by plaintiff's economic report and the Sharp plans.

10. The defendant did not have any plans for a vessel such as the Natalie O. Warren, or the design for such a vessel, prior to the time plaintiff disclosed to defendant its economic report and the Sharp plans.

11. The design of the vessel Natalie O. Warren is basically similar to the Sharp plans.

12. The Natalie O. Warren is unique and defendant has made application for letters patent in connection with the plans for said vessel; the Sharp plans involved new and novel ideas and theories of design.

13. Defendant employed or made use of plaintiff's economic report and the Sharp plans, or the theories and ideas set forth in the same, for its own benefit without compensating plaintiff therefor, although defendant knew or should have known plaintiff had expended or become obligated to pay a substantial sum of money of approximately $40,000 in connection therewith.

### Conclusions of Law.

1. This Court has jurisdiction of the parties and the subject matter in this case.

2. Plaintiff had a property or proprietary right in its economic report and the Sharp plans and the same constituted trade secrets, or should in law be treated the same as trade secrets when revealed in confidence.

3. Plaintiff's disclosure of its trade secrets to defendant was made under circumstances which created a relationship of trust and confidence between plaintiff and defendant.

4. Defendant employed or made use of plaintiff's trade secrets in violation and breach of the trust and confidence reposed in it by plaintiff.

5. Plaintiff is entitled to equitable relief against defendant.