**NEWELL v. O. A. NEWTON & SON CO. et al.**

**Civ. A. 1197.**

United States District Court
D. Delaware.

March 31, 1952.

See also, D.C., 95 F.Supp. 355.

Thomas Cooch, of Morford, Bennethum, Marvel & Cooch, of Wilmington, Del. and K. Thomas Everngam of Denton, Md., for plaintiff.

Hugh M. Morris and George T. Coulson, of Morris, Steel, Nichols & Arsht, of Wilmington, Del., for defendants.

RODNEY, District Judge.

This is a motion for involuntary dismissal under Rule 41(b), Federal Rules of Civil Procedure, 28 U.S.C. The action is for damages and injunctive relief growing out of alleged unfair competition. Jurisdiction in this court is founded on diversity of citizenship and the amount in controversy is in excess of $3,000.

The following are undisputed facts.

George A. Newell, the plaintiff, was at the time of the alleged acts owner of a small machine shop in Hurlock, Md.

The defendant, O. A. Newton & Son Company (hereinafter referred to as Newton), is a corporation of the State of Delaware dealing with agricultural and poultry products and farm machinery, mostly in Kent and Sussex Counties, Delaware and the Eastern Shore of Maryland, with its main office in Bridgeville, Delaware.

The defendant, Kenneth Baker (hereinafter referred to as Baker), at the time of the alleged acts, was sales manager for Newton, and has had considerable experience and education along agricultural lines.

The gravamen of the offense charged is that through confidential information supplied by Newell, Newton built and placed upon the market a light conveyor similar in a great many respects to that sold and built by Newell.

In the summer of 1948 Newell completed his conveyor and called it a "chicken house manure and carry-all conveyor." Upon its completion Newell telephoned Baker to come down to Hurlock as they "had something to show him." Baker arrived later the same day and there ensued a discussion as to exhibiting the conveyor with the Newton exhibit at the Harrington Fair which opened to the general public on Tuesday, July 27, 1948, and it was so exhibited.

From this point on the facts are in some dispute.

At the time of the aforementioned meeting some oral agreement was reached in respect to the sale of the conveyors manufactured by Newell. Newton was to receive a seven and one-half per cent "commission"[1] on all sales made by him of the chicken house manure and carry-all conveyors. There is no evidence that Newton should have an exclusive sales contract; indeed, what evidence there is of the understanding is to the contrary.

Under the agreement and by subsequent orders Newell produced ten conveyors which were billed to Newton and then sold by Newton to various purchasers. The evidence is not entirely clear as to whether the sales made by Newton were as a result of the showing at the Harrington Fair or by subsequent sales promotion.

During this contract performance the testimony shows that all but two of the conveyors were delivered directly to Newton. Newell testified also that it was no concern of his who bought the conveyors from Newton. Further testimony shows he knew nothing concerning payment by these third persons to Newton, but Newton was always "very prompt in sending checks."

[1]. This "commission" has been variously referred to in the transcript and briefs as "discount," "percentage" or "commission."

Newton's records show that checks were sent in all but two cases on the day of receipt by Newton of Newell's bill.

The contract between Newell and Newton was formally terminated by a letter of September 21, 1948, from Newton to Newell.[2]

On February 3, 1949, Newell was put on notice that a conveyor similar to his own was being built by the Delaware Aircraft Industries, Inc. of Greenwood, Delaware. Newell that day drove to Greenwood and inspected the conveyors of that plant which were in various stages of completion. In his own words "they are practically mine." On the following day Newell, with his attorney, went to Newton's office in Bridgeville. From the conversation there had with Baker, Newell was informed of contracts let by Newton to Delaware Aircraft Industries for the construction of some twenty-five conveyors, some of which Newell had seen on the previous day. These contracts between Newton and Delaware Aircraft Industries had been entered into sometime in the fall or winter of 1948 after the termination of the Newell-Newton contract.

On March 9, 1949, the complaint was filed in this case. The plaintiff claims:

(1) That he was first in the field of conveyors especially adapted for the removal of chicken house manure due to the narrow width of the chicken house door, effect of manure on certain types of chains and belts, and the maneuverability by one person.

(2) By reason of the above, the design and machine had novelty which created a property right in the plaintiff and which should be protected as a trade secret when revealed in confidence or under circumstances which create a relation of trust and confidence.

(3) The relationship of plaintiff and defendant was one which necessitated rudimentary requirements of good faith.

(4) The defendants copied the design of the plaintiff's conveyor in violation of the confidence reposed and are thereby guilty of unfair competition.

The defendants assert:

(1) That no trade secret was revealed to the defendants by the plaintiff since there was prior disclosure to the general public.

(2) Unless barred by well-known equitable principles, any person may manufacture and sell an unpatented article that has been previously manufactured by another without being guilty of unfair competition, even though in all essential features that one article is an exact simulacrum.

(3) Relationship between plaintiff and defendants was one of seller and purchaser —not that of principal and agent.

2. "September 21, 1948
"Mr. George Newell
Hurlock, Maryland
"Dear George:
"We have been giving careful consideration to the possible continuation of purchasing conveyors from you.
"You may recall that prior to the time of the Harrington Fair this year, I agreed to have you exhibit one of the Model A Conveyors with our exhibit and with the understanding that we would receive 7½% on all sales made at that time. I also mentioned to you both in our initial conversations at the Fair and since that time that we could not possibly continue to handle these conveyors with such a small margin. However, you do not feel it advisable to make any change and also advised me that the cost of the conveyors will be increased $25.00.
"After consideration of these factors we do not feel that we can continue to serve as a retail outlet and therefore am writing this letter to give you this information for the record. You stated on several occasions that if we did not care to handle them on a 7½% basis that you had numerous other people that had been asking for this privilege, therefore, I assume this will not create any hardship on your part.
"I regret that it is impossible for us to continue on the 7½% basis but want to take this opportunity to express our appreciation for the opportunity of working with both you and Melvin. It has been a real pleasure to work with you and I trust that we may be able to conduct other lines of business together in the future.
"Very truly yours,
/s/ O. A. Newton & Son Co.
Kenneth W. Baker,
Sales Mgr."

(4) There was no confidential relationship from which there can be inferred a promise by the defendants not to compete with the plaintiff in the manufacture and production of a conveyor similar to that of plaintiff's.

■ The doctrine of unfair competition is founded upon the principles of common business integrity. A court of equity will always protect one's trade secret when a disclosure in confidence is followed by a use which is in direct violation of the confidence in which it is disclosed.

■ The elements which are necessary to sustain this kind of action include: (1) the plaintiff must have a species of property in the invention, process, trade secret or discovery; (2) there must be a disclosure of that trade secret, or similar matter, to another in confidence or by virtue of a relationship of a nature from which there may appear or be implied a covenant not to use or disclose the information so secretly or confidentially imparted; and (3) a use or disclosure of the information in violation of the obligation thus incurred.

A proper application of the facts of this case to the contentions of the parties indicates that there are here involved two main questions for consideration which, while seemingly somewhat separate, yet are to some extent interdependent. These are: (1) the existence in the plaintiff of some information or knowledge in the nature of a trade secret; and (2) the unauthorized use or disclosure of that information under circumstances rendering such use or disclosure a breach of good faith.

"A trade secret may consist of any formula, patent, device, plan, or compilation of information which may be used in one's business and which gives a person an opportunity over his competitor."[3]

In connection with a discussion of a trade secret there are here presented certain principles which seem somewhat inharmonious but which seem readily reconcilable. These

would include the application of the principles of unfair competition to the manufacture of an unpatented article by one person after such unpatented article had previously been manufactured and disclosed by another. In this case I am not concerned with any patent upon the machine here involved. It is true that the plaintiff made application for and subsequently received a patent for the machine in question, but both the application and the subsequent issue of the patent were of dates subsequent to all of the times material in the present case. Insofar as this case is concerned, the issues involve an unpatented article.

In this Circuit Judge Gray said,[4] "a person may manufacture and sell an unpatented article that has been previously manufactured by another, without being guilty of unfair competition, even though in all essential features the one article is an exact simulacrum of the other."

To the same effect is Raenore Novelties v. Superb Stitching Co., Sup., 47 N.Y.S.2d 831, and cases there cited. This principle seems supported by all the authorities when disassociated from the principle of confidential relationship. Indeed, I think the likeness between the two articles mentioned in Rice v. Redlich may be more exact than that which is indicated by the word "simulacrum," some of the definitions of which include an unreal resemblance. The resemblance may be a very real one.

■ It seems quite clear that while a trade secret may involve such novelty as is required for patentability and a trade secret, to be protected, must contain some element of value or usefulness, yet a trade secret need not contain such novelty as would make it patentable. The protection given to a trade secret is independent of the patent laws and covers not the invention itself, but the secrecy of the information under the given set of circumstances.

■ Consideration of the existence of a trade secret in this case must involve a number of elements, among which is the

3. International Industries v. Warren Petroleum Corporation, D.C., 99 F.Supp. 907, 914; Restatement of Torts, Sec. 757(b).

4. John H. Rice & Co. v. Redlich Mfg. Co., 3 Cir., 202 F. 155, 157.

element of secrecy itself. A trade secret must, in its very nature and from its very definition, involve to some degree an element of secrecy. Matters of public or general knowledge cannot form the basis of a trade secret. "Matters which are completely disclosed by the goods which one markets cannot be his secret." [5]

█ The defendants contend that the manufacture and exhibition of the machine of the plaintiff was a public disclosure of all the matters connected with it and, since it was visible to anyone who viewed it, hence there could have existed no trade secret. This element of secrecy is comparative in nature and dependent upon the facts. The protection begins and ends with the life of the secrecy and the secrecy to be protected depends upon the degree of public knowledge.

The acts of the plaintiff as affecting the disclosure and as relating to the required secrecy in this case must be considered with relation to two distinct dates of disclosure: (a) during the manufacture and completion of the machine in the machine shop at Hurlock, Maryland, and (b) the exhibition of the completed and unpatented machine at the Harrington Fair.

█ (a) Prior to July, 1948, and prior to any connection of the defendants with the machine in question or any knowledge on their part of its existence it was being manufactured in a small shop in a small village (Hurlock) in a rural county of Maryland. It was being worked on openly in the shop and could be seen by anyone who entered. Indeed, two witnesses saw it being manufactured. I do not think, however, that the conduct of the plaintiff in his shop at Hurlock was such a disclosure as would have prevented the application of the principle of secrecy as constituting a trade secret if such principles depended upon that act alone. There is no evidence that the machine being constructed was seen by anyone competent to evaluate its structure or parts and it would appear that a sufficiently substantial element of secrecy existed.

(b) The exhibition of the machine at the Harrington Fair was a different matter. There the completed machine was publicly displayed with all the completed parts. The exhibition was either at the request of the plaintiff or with his knowledge and approval. The machine was exhibited with the intention that it should be seen by everyone who had special knowledge of such machines and of the peculiar and valuable characteristics connected therewith. The disclosure of the characteristics of this unpatented machine, then, was more complete after its exhibition at the Harrington Fair.

It is unnecessary to consider the effect of the disclosure resultant from the exhibition of the machine at the Harrington Fair. After that disclosure it is possible that there is a distinction between the rights of the plaintiff against the public at large obtaining their knowledge from that disclosure as contrasted against the rights of the plaintiff against a party who antecedently obtained his knowledge under a confidential relationship not to use or divulge the trade secret inherent in the machine. Most of the cases collected in the annotation in 170 A. L.R. 449, 486, hold there is such distinction, but in Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895, it is intimated that even if the defendants were originally under an implied obligation not to use the complainant's invention for their own purposes, the obligation was ended when the complainants disclosed the secret to a considerable number of persons. In any event, the distinction, if existing, depends upon the existence of a confidential relationship between the parties and, as indicated in Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016, this must be the starting point.

The plaintiff, while contending that the relationship between the parties was that of principal and agent, yet does not rely upon that relationship alone, but contends that generally the relationship was one in which were required "the rudimentary requirements of good faith."

The defendants deny any confidential relationship of any kind and contend that at the most the relationship was that of buyer

5. Restatement of Law of Torts, Vol. 4, p. 6, Sec. 757b.

and seller, from which no promise not to compete may be inferred.

The plaintiff relies heavily upon International Industries, Inc., v. Warren Petroleum Corp., D.C.Del.1951, 99 F.Supp. 907, but that case seems clearly distinguishable upon the facts. In the cited case both the plaintiff and defendant were interested in the water transportation of liquified petroleum gas. The defendant seems to have been interested in converted tankers as a means of transportation, while the plaintiff was developing the use of dry cargo ships by the installation of vertical tanks which had not theretofore been so used. The plaintiff sent to the defendant an economic study of the various elements to be considered in connection with the desired transportation of liquified petroleum gas. This economic study was acknowledged by the defendant, which stated, "The information you have given us is very interesting and of value, and we are trying to work some ideas out on terminal facilities." Subsequently, the plaintiff had plans prepared by a naval architect at a cost of over $40,000 and adapting vertical tanks into dry cargo ships. These plans were furnished by the plaintiff to the defendant. Subsequently, at a later meeting of all the parties, these plans were again presented, examined and explained and left for a time with the defendant and its associates. After seeing and considering the plans, the defendant stated that it was not interested in the subject matter of the discussion. The defendant, however, soon thereafter converted a dry cargo vessel for the transportation of liquified petroleum gas involving vertical tanks and the design of which vessel was found to be basically similar to the plans of the plaintiff theretofore furnished by the plaintiff to the defendant.

Under these circumstances, the court held that the information and plans of the plaintiff, developed while the parties were working out a matter of mutual interest, and which plans were furnished to the defendant, were charged with the relationship of trust and confidence, and could not be appropriated by the defendant in breach of that relationship.

In the present case the defendant was entirely without knowledge of the plaintiff's machine until it was completed and ready for the market. It was the plaintiff who desired the defendant to market the machine and that seems to have been the sole purpose of the first interview. The defendant was to contribute nothing to the marketing of the machine but its sales organization and promotion efforts and for these was to obtain a fixed sum.

The plaintiff has alleged a confidential relationship between the parties, but I find no facts upon which such relationship can be based. The plaintiff has attempted to show that the defendant was the plaintiff's agent, but the facts and applicable law do not sustain that position.

Newton placed only two orders with Newell, one on August 2, 1948, for nine conveyors and the other on August 10, 1948, for one conveyor. It would appear that at least the first order was as a result of the exhibition at the Harrington Fair during the week of July 26, 1948. In all but one case the payment made by the customer to Newton was subsequent—by times varying from one to 92 days—to payment by Newton to Newell. Newell had no control over the sale of the conveyor to Newton's customer. On this point Mechem on Sales is particularly applicable:

"Sec. 43. *Sale as distinguished from agency to sell or consignment*—The essence of sale is * * * the transfer of the title to the goods for a price paid or to be paid. Such a transfer puts the transferee, who has procured the goods to sell again, in the attitude of an owner selling his own goods, and makes him liable to the first seller as a debtor for the price, and not, as an agent, for the proceeds of the resale. The essence of the agency to sell is the delivery of the goods to a person who is to sell them, not as his own property but as the property of the principal, who remains owner of the goods and who therefore has the right to control the sale, to recall the goods, and to demand and receive their proceeds when sold, less the agent's commission, but

who has no right to a price for them before sale or unless sold by the agent." Mechem, Sales, Vol. 1, pp. 40, 41, Sec. 43.

I conclude that Newton was a re-sale dealer receiving seven and one-half per cent discount on all sales made by him. There are no other facts to characterize the arrangement as an agency. Beyond the fact that the defendant was a re-sale dealer for a specific discount I can find no facts that would make the relationship a confidential one.

A discussion as to proper parties to the action or other issues seems unnecessary since it is found that there was no confidential relationship between the parties.

Separate findings of fact and conclusions of law are filed herewith.

An appropriate order may be submitted.