248 F.2d 696
 INTERNATIONAL INDUSTRIES, Inc., Appellant,
v.
WARREN PETROLEUM CORPORATION, Warren Maritime Corporation.
INTERNATIONAL INDUSTRIES, Inc.,
v.
WARREN PETROLEUM CORPORATION, Warren Maritime Corporation, Appellants.
 No. 12170.
 No. 12171.
 United States Court of Appeals Third Circuit.
 Argued June 11, 1957.
 Decided September 26, 1957.
 Rehearing Denied October 25, 1957.
 
 COPYRIGHT MATERIAL OMITTED Aaron Finger, Wilmington, Del. (Richards, Layton & Finger, Wilmington, Del., Warren M. Sparks, Tulsa, Okl., on the brief), for Warren Petroleum Corp. and Warren Maritime Corp.
 John H. Poe, Tulsa, Okl. (David F. Anderson, Berl Potter & Anderson, Wilmington, Del., Poe, Murdock & Langford, Tulsa, Okl., on the brief), for International Industries, Inc.
 Before MARIS, STALEY and HASTIE, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 Questions involving the appropriate equitable relief to be granted for the alleged breach of trust in the appropriation of certain trade secrets are presented in these appeals.
 
 
 2
 The defendants, Warren Petroleum Corporation and its wholly-owned subsidiary, Warren Maritime Corporation, will be treated for our purposes as one entity. Defendant Warren produces and markets liquefied petroleum gas, known to the industry as LPG. This gas is delivered to distribution and marketing points either by rail or water. Plaintiff had compiled an economic study explanatory of the factors to be considered in the water transportation of LPG and possessed plans and specifications for the conversion of a dry cargo vessel into one which might be used in the transportation of the liquid gas. The plans for the conversion were known as the "Sharp Plans." Plaintiff alleged that the economic study and the plans and specifications contained novel ideas and were trade secrets. Plaintiff further alleged that these secrets were revealed to defendant under circumstances creating a confidential relationship, and that defendant appropriated the trade secrets in violation of the trust reposed in it.
 
 
 3
 Upon the merits of the case, the district court found in favor of plaintiff, deciding that it was entitled to equitable relief against defendant because of defendant's wrongful appropriation of the trade secrets relating to the marine transportation of LPG, and that in so doing, defendant violated the trust and confidence created by the circumstances surrounding the revelation of the plans. D.C.Del.1951, 99 F.Supp. 907. Plaintiff had requested an injunction in addition to an accounting of the benefits derived from the use of the trade secrets. A sealed affidavit of Mr. Brennan, an official of defendant Warren, convinced the district court that injunctive relief would not be in the public interest, and in the denial of the injunction the district court held that plaintiff could be compensated by a monetary award. See E. I. DuPont de Nemours & Co. v. Temple, 4 Cir., 1921, 272 F. 456, and 1 Pomeroy, Equity Jurisprudence § 237e, pages 400, 441. The district court thereupon referred the question of damages to a special master.
 
 
 4
 The appeal of Warren attacking the findings of the district court that there had been a tortious appropriation of trade secrets need not long detain us. That appeal goes to the findings of fact of the district court. A careful study of the record makes it abundantly clear that there is ample evidence to support those findings. It is not necessary for us to add anything to the district court's careful and well-reasoned opinion which contained adequate record references indicating the evidence upon which the findings were based. We will affirm the district court's finding that defendant tortiously appropriated trade secrets of plaintiff.
 
 
 5
 The report of the special master as to the damages can best be understood against the backdrop of a fuller discussion of the facts. Defendant Warren has been since 1922 a manufacturer and marketer of LPG. Looking for new outlets, in 1944 it commenced investigating the possibility of water transportation of the liquid gas from its source of origin in the Texas fields. The trade secrets appropriated by defendant enabled it to have converted a dry cargo vessel into one outfitted for the marine transportation of LPG. This vessel was the Natalie O. Warren. Prior to the construction and use of the vessel, defendant sold its product f. o. b. the several points of production in Texas. This, of course, precluded its enjoyment of the vast market of the East and the Eastern Seaboard. After the acquisition of the Natalie O. Warren, defendant sold its product f. o. b. Newark, New Jersey. This was accomplished by transporting the product from the source of supply to a terminal at Norsworthy, Texas, where it was gathered, stored, and loaded aboard the Natalie O. Warren. It was then taken by water to a like terminal facility at Newark, where it was sold to customers f. o. b. Newark.
 
 
 6
 The special master, after lengthy hearings on the question of damages, issued a report which the district court adopted and made the basis of its judgment. D. C.Del.1956, 146 F.Supp. 157.
 
 
 7
 Both plaintiff and defendant seem to agree that the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine the damages for copyright infringement. Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825.[1] Damages are allowed in trade secret cases, not upon the theory of the taking of property, but rather upon the theory of a breach of a confidential relationship. E. I. DuPont de Nemours Powder Co. v. Masland, 1917, 244 U.S. 100, 37 S.Ct. 574, 61 L.Ed. 1016; Restatement, Torts § 757 and comment a (1939). The appropriate measure of damages, by analogy to patent infringement, is not what plaintiff lost, but rather the benefits, profits, or advantage gained by defendant in the use of the trade secret. See Tilghman v. Proctor, 1888, 125 U.S. 136, 146, 8 S.Ct. 894, 31 L.Ed. 664, and In re Cawood Patent, 1877, 94 U.S. 695, 710, 24 L.Ed. 238. The advantage enjoyed by defendant is to be measured by the standard of comparison method. This method contemplates the comparison of the cost of transportation by means of the use of the trade secret with a method of accomplishing the same result which would have been open to defendant had he not appropriated the trade secret. Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 133 F.2d 487, affirmed 1943, 320 U.S. 714, 64 S.Ct. 257, 88 L.Ed. 419. The master found that the proper standard with which to compare the marine transportation of LPG was that of railroad transportation.
 
 
 8
 Although Warren attacks this choice as improper, we are satisfied that it was appropriate as a standard because it was a method available at the time of the appropriation. See Gordon Form Lathe Co. v. Ford Motor Co., 133 F.2d at page 497. Parenthetically, it should be noted that the findings of the master's report should not be set aside unless they evidence clear error. Tilghman v. Proctor, 125 U.S. at pages 149-150, 8 S.Ct. at page 901; Gordon Form Lathe Co. v. Ford Motor Co., 133 F.2d at page 498. Having adopted rail transportation as the standard, the special master compared the total cost of all means of transportation from the source of the product to the ultimate consumer, with the following results:
 
 
 9
 Costs with the use of the Natalie O. Warren

 "(1) Transportation cost from plants to Norsworthy
 Terminal Defendants' Exh. 561,
 revised including subtraction of $3,766.18
 being the amount of additional mileage
 earnings based on readjusted number of
 miles $ 763,891.20 (1)

 (2) Norsworthy operating expenses, including
 depreciation (Plaintiff's Exh. BB) 496,885.21 (2)

 (3) Interest on investment Norsworthy Terminal
 (Plaintiff's Exh. JJ) 189,972.06 (3)

 (4) Tanker operating costs (Plaintiff's Exh.
 DD, adjusted as to accrual account) 3,032,174.65 (4)

 (5) Interest on Investment, Tanker (Plaintiff's
 Exh. JJ) 494,970.54 (5)

 (6) Cost of Operating Newark Terminal
 (Plaintiff's Exh. EE) 783,488.67 (6)

 (7) Interest on Investment, Newark Terminal
 (Plaintiff's Exh. JJ) 291,346.92 (7)

 (8) Tulsa Direct Office expenses (Plaintiff's
 Exh. EE) 15,646.29 (8)

 (9) Tulsa office overhead
 (a) Tanker 114,583.33 (9a)
 (b) Terminals 114,583.33 (9b)

 (10) Product Lost in Transit
 (Defendants' Exh. 530) 52,099.77 (10)

 (11) Transportation, Newark to customers.
 (Defendants' Exh. 530, adjusted) 2,811,726.27 (11)
 _____________
 (12) Total Transportation costs $9,161,368.24 (12)"
 
 
 10
 The master found that the cost of all rail transportation for the same period and for the same quantity of LPG would have been $8,712,231.49. This figure takes into account the master's finding that if the transportation costs were compared, with delivery to the ultimate consumer in each method of carriage, neither the Norsworthy nor the Newark terminals would be used in rail transportation. Having found that there was no benefit to defendant by the use of water transportation as compared to rail transportation, the master allowed a reasonable royalty to plaintiff of $75,000, and $20,000 as plaintiff's apportioned share of a fee of $50,000, known in the litigation as the Ligasco fee, which defendant got from third persons, for furnishing the plans for the construction of vessels for the transportation of LPG and further for imparting the technical skill and experience it acquired in the water transportation of the product. The master determined that forty per cent of the fee was attributable to the original plans of plaintiff and sixty per cent was attributable to defendant's technical experience and skill. The total recovery of $95,000 allowed by the master was adopted by the district court which entered judgment on the master's report.
 
 
 11
 Both plaintiff and defendant have attacked the findings and conclusions in the accounting phase of the litigation. Plaintiff argues that only the transportation from Norsworthy to Newark should have been considered in the comparison to determine benefits, while defendant argues that if rail were a proper comparison, the master correctly determined that the use of the Natalie O. Warren resulted in higher cost than rail transportation. Defendant argues, moreover, that the royalty of $75,000 was excessive. Plaintiff makes the further contentions that no interest should have been allowed on the capital investments in the cost comparison, and that it is entitled to the entire Ligasco fee of $50,000 because of the lack of evidence to support the master's apportionment.
 
 
 12
 Application of the Standard of Comparison.
 
 
 13
 It will be remembered that the Master arrived at the conclusion that that transportation which included the use of the Natalie O. Warren was more costly than all-rail transportation by comparing the expenses of carriage from the source of supply to the ultimate consumer. We are of the opinion that this was clear error. It is implicit in the rule that the proper comparison is between the cost of obtaining the result achieved by the use of the infringing method or device with the cost of obtaining the same result by the method selected as the standard of comparison. Any other conclusion would belie the plain meaning of the word comparison. While the master considered the cost of transportation to the ultimate consumer, it is plain that the result sought by defendant was not the control of the cost of transportation from the f. o. b. point to the consumer, for it is obvious that neither the rate nor the means of that transportation could be within defendant's control.[2] Rather, the result sought was the most inexpensive means of transportation to Newark, the market place selected by defendant from which distribution of its product could be made f. o. b. — that is, the most inexpensive intra-company transportation. As this method of doing business included the use of Newark as a market place to obtain the maximum benefits from the Natalie O. Warren, defendant cannot now complain if, in measuring the extent of those benefits, the standard of comparison is applied to that very method. It follows that the comparison should have been made as to both means of transportation from the source of supply to the f. o. b. point in Newark, and not to the ultimate consumer.
 
 
 14
 The master found that in the determination of the cost of rail transportation from the source of supply to the ultimate consumer the terminals at Norsworthy and Newark would not be used by defendant. From the record, it is fairly evident that defendant would not use the Norsworthy terminal in rail transportation. However, if defendant were to market its product f. o. b. Newark after rail shipment, the record is not clear as to the necessity of the Newark terminal. On remand, when the district court determines the comparative costs of intra-company transportation from the supply source to the Newark terminal, it must answer the question of whether the Newark terminal would be necessary if the product were sold f. o. b. Newark and rail transportation only were used. If it would be necessary, the inclusion of the cost of that installation in the comparison would be proper.
 
 
 15
 Interest on the Invested Capital.
 
 
 16
 In the computation of the comparative costs of transportation, the master allowed interest on the capital investments at the rate of 3½%. This interest was computed as to the Norsworthy and Newark terminals and as to the vessel Natalie O. Warren. Plaintiff attacks the allowance of interest in the comparative analysis on several grounds, the principal ones being the fact that the appropriation was willful and deliberate and that while interest might be allowed as a credit against "profits," it should not be permitted in a case comparing "savings."
 
 
 17
 The attempted distinction between profits and savings is wholly without merit. The recovery in trade secret or infringement cases is denominated profits. Where the thing appropriated or infringed is a process rather than a manufactured article, the profits are simply measured by the savings determined by the standard of comparison computation. Macbeth-Evans Glass Co. v. L. E. Smith Glass Co., 3 Cir., 1927, 23 F.2d 459, 461-462; Gordon Form Lathe Co. v. Ford Motor Co., 133 F.2d at page 492; Tilghman v. Proctor, 125 U.S. at page 146, 8 S.Ct. at page 899.
 
 
 18
 Nor is there merit to the argument that interest should be withheld in the comparison because the appropriation was willful or deliberate. This contention was advanced in Duplate Corp. v. Triplex Safety Glass Co., 3 Cir., 1935, 81 F.2d 352, modified 1936, 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274, but since it was held that the infringement was not deliberate, our court did not rule on the issue. We are in accord with the decision of the Fourth Circuit in Sutton v. Gulf Smokeless Coal Co., 1935, 77 F.2d 439, to the effect that interest is to be calculated in the comparison without regard to the nature of the infringement. The item of interest is not to be used as an instrument of punishment. The infringement or appropriation itself is wrongful, and a monetary recovery is provided as a remedy for that wrong. The interest on the capital which the appropriator invests in his endeavor is allowed in an effort to arrive at a realistic determination of the actual costs in the standard of comparison analysis. This is a practical business problem to be solved by a method as accurate as possible, and the disallowance of interest would merely distort the actualities of the money expended.
 
 
 19
 Finally, case law authority uniformly permits the credit of interest in the determination of profits. Seabury v. Am Ende, 1894, 152 U.S. 561, 569-570, 14 S. Ct. 683, 38 L.Ed. 553; Duplate Corp. v. Triplex Safety Glass Co., 81 F.2d at page 356 (here it stated that the weight of authority favors crediting interest against profits); Sutton v. Gulf Smokeless Coal Co., 77 F.2d at page 441; Lawrence-Williams Co. v. Societe Enfants Gombault et Cie, 6 Cir., 1931, 52 F.2d 774, 778; Producers' & Refiners' Corp. v. Lehmann, 8 Cir., 1927, 18 F.2d 492, 502 (the allowance of interest is spoken of as equitable and just and in accord with the weight of authority); Barber Asphalt Paving Co. v. Standard Asphalt & Rubber Co., 7 Cir., 1928, 30 F.2d 281, 284 (interest at the rate of 5% approved); Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 2 Cir., 1934, 73 F.2d 62, 64, certiorari dismissed Zenith-Detroit Corporation v. Bendix Stromberg Carburetor Co., 1935, 294 U.S. 735, 55 S. Ct. 509, 79 L.Ed. 1263. And the credit for interest is allowed without regard to the source of the capital invested. Stromberg Motor Devices Co. v. Detroit Trust Co., 7 Cir., 1930, 44 F.2d 958, 964.
 
 
 20
 It is our opinion that interest should be allowed on the necessary capital invested by defendant in the water transportation and in the comparative railroad transportation.
 
 
 21
 The Ligasco Fee.
 
 
 22
 In February of 1949, after the appropriation of the trade secrets of plaintiff, defendant entered into an agreement with Ligasco Supply and Socony-Vacuum Oil Co. to supply plans, designs, and technical experience gained in the conversion of the Natalie O. Warren for the purpose of converting one or more dry cargo vessels into tankers for the carriage of LPG. For these services, defendant received a fee of $50,000. It is plaintiff's position that it is entitled to the entire fee because of the lack of evidence upon which to base an apportionment of the fee between that part attributable to the ideas acquired from plaintiff's Sharp Plans and the amount attributable to the technical skill of defendant. Plaintiff argues that the master found evidence looking to the apportionment lacking but nevertheless apportioned the fee forty per cent to plaintiff's plans and sixty per cent to defendant's skill. A closer reading of the master's report, however, indicates a twofold approach to the division of the fee. The master found, based on expert testimony not unlike that approved in Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, that the technical experience of defendant contributed sixty per cent to the Ligasco fee. It was to defendant's further argument that even as to the plans there should be an apportionment to reflect defendant's improvements that the master answered that evidence of the apportionment was lacking.
 
 
 23
 The master's apportionment of the Ligasco fee was proper, and we approve of it.
 
 
 24
 The master's computation of damages considered the accounting period from December 1947 to June 1952. With the master's conclusion that there was no saving from the use of the trade secrets in the Natalie O. Warren, there was no necessity to calculate any damages from the continued use of the tanker, except on a royalty basis. However, with the element of transportation from the f. o. b. point to the consumer excluded from the comparative analysis, a substantial saving will result in the use of the vessel. This raises the additional issues of the computation of damages from the end of the accounting period to the present date, and even for future damages for as long as the ship is used by defendant Warren.
 
 
 25
 On June 26, 1951, the district court denied plaintiff an injunction upon a consideration of the circumstances and events which obtained on that date. The intervening years might have changed the urgent necessity for the denial of injunctive relief. Upon remand, the district court will be directed to reexamine the request of plaintiff for injunctive relief, and if the relief be granted, the court should compute damages to date in accordance with this opinion. If the district court again finds it necessary to refuse the issuance of an injunction, it must compute not only damages to date, but also make some provision for future benefits attendant upon the use of the Natalie O. Warren.
 
 
 26
 The decision of the district court that there was tortious appropriation of trade secrets will be affirmed. The judgment on the master's accounting will be reversed and the cause remanded for further consideration of injunctive relief and recomputation of damages not inconsistent with this opinion.
 
 On Petition for Rehearing
 
 27
 A petition for rehearing has been filed by defendant Warren. The district court had originally found that plaintiff's Sharp plans and economic reports contained novel ideas and constituted trade secrets which were disclosed in confidence and appropriated by defendant. It was our conclusion that these findings of the district court were not clearly erroneous. Warren argues in the petition for rehearing that the evidence upon which the district court and this court relied discloses nothing novel in the Sharp plans which would constitute a trade secret susceptible of appropriation by Warren.[1] To be sure, the evidence of defendant Warren indicated that plaintiff's plans and studies disclosed nothing novel. Our purpose, however, is not to weigh the evidence, but to review the record with the object of determining whether the findings of the district court were clearly erroneous — that is, whether we are left with a firm impression that the findings were wrong.
 
 
 28
 A review of the record discloses ample evidence to support the findings that the Sharp plans were novel, that they were disclosed in confidence to the defendant, and that they were appropriated by defendant and used in the construction of the Natalie O. Warren. Mr. Sharp himself gave expert testimony that the plans his firm prepared were original. Mr. Edward V. Lewis, a naval architect, testified in detail about the basic novelty of the plans and the original features embodied in them. Several other experts testified that the plans were new and that the design of the Natalie O. Warren was basically similar to plaintiff's plans. Mr. Harry Marlow, a naval architect who testified as an expert on behalf of defendant, had written a technical article on the water transportation of LPG in which he described the conversion of the Natalie O. Warren as "unique." To the contention that the Natalie O. Warren contained nothing new, we need answer only that it was considered novel enough by the defendant that patents were applied for to protect the plans.
 
 
 29
 Aside from oral testimony, documentary evidence and correspondence indicated that Warren did not conceive of the idea of converting a dry cargo vessel into one for the carriage of LPG. While it would serve no useful purpose to recount this evidence here, it is clear that the basic concepts embodied in the Natalie O. Warren came to defendant's attention only after examination of plaintiff's plans and economic study. See opinion of the District Court, 99 F.Supp. 907, 912-913, note 7.
 
 
 30
 While the evidence of novelty and appropriation was conflicting, there was ample evidence to support the court's findings, and we cannot say those findings were clearly erroneous.
 
 
 31
 The petition for rehearing asks us to instruct the district court to pass upon the questions of apportionment of the savings, the effect of the Newark fire loss, and the rate of interest allowed in the computations. Our opinion was not intended to foreclose the right of defendant Warren to raise any appropriate issue which the district court did not resolve because of its prior disposition of the case.
 
 
 32
 Other points raised in the petition were adequately considered and discussed in the opinion.
 
 
 33
 The petition for rehearing will be denied.
 
 
 
 Notes:
 
 
 [1]
 Federal jurisdiction in this case is based upon diversity of citizenship. Normally, Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, would be applicable in the resolution of the common law questions involved. However, general federal law will be applied in view of the absence of an allegation that any local law differs from federal law, and because the parties have relied wholly upon federal precedents. Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 113 note 1, 59 S.Ct. 109, 83 L.Ed. 73
 
 
 [2]
 It might well be pointed out that the rates for rail transportation from the several f. o. b. points are fixed by the I.C.C. The long haul rate from the Texas fields to the consumer is much lower per mile than the short haul rate from Newark to the consumer. If the Natalie O. Warren had been used in public transportation, a joint water-rail rate of course would have been established from the point of origin to the consumer, which undoubtedly would have reflected the benefits obtained from its use. See Dixie Carriers, Inc., v. United States, 1956, 351 U.S. 56, 76 S.Ct. 578, 100 L. Ed. 934
 
 
 [1]
 It is said in the Restatement of the Law of Torts, § 757, comment b (1939), that a trade secret:
 "* * * may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability."
 Inasmuch as this record discloses novelty in the Sharp plans and economic study, as is demonstrated in the body of this opinion, it is unnecessary to discuss the rule of the Restatement.