INTERNATIONAL INDUSTRIES, Inc.,
Plaintiff,

v.

WARREN PETROLEUM CORPORA-
TION and Warren Maritime Cor-
poration, Defendants.
Civ. A. 1124.

United States District Court
D. Delaware.
Oct. 12, 1956.

David F. Anderson (of Berl, Potter & Anderson), Wilmington, Del., and John E. Poe (of Poe, Murdock & Langford), Tulsa, Okl., for plaintiff.

Aaron Finger (of Richards, Layton & Finger), Wilmington, Del., Warren M. Sparks, James E. Allison, Harry Moreland and James T. Dolan, Tulsa, Okl., for defendants.

LEAHY, Chief Judge.

A factual account of this litigation is reported in D.C.Del., 99 F.Supp. 907. Liability was found, and the measure and amount of damages was referred to the late Josiah Marvel, Jr., Esq., as Special Master. His report was filed before his death. The substance of his findings are as follows:

1. The proper standard of comparison to be used in computing the extent of benefits resulting to defendants is, on the one hand, one of rail, and, on the other, one of part rail and part water.

2. The following items, totaling $9,-161,368.24, using $3\frac{1}{2}\%$ as the rate of interest on investment, make up the part

rail and part water transportation costs during the seven month period ending June, 1948, and the fiscal years to June 1952:

(a) Transportation cost from plant of manufacture to Norsworthy Terminal, including cost of product lost in transit but excluding the temporary loss of fixed assets .......................................... $ 815,990.97

(b) Operating expenses of Norsworthy Terminal, including depreciation ............................... 496,885.21

(c) Interest on average net investment of Norsworthy Terminal ....................................... 189,972.06

(d) Operating expenses of S.S. "Natalie O. Warren", including depreciation ............................ 3,032,174.65

(e) Interest on average net investment of S.S. "Natalie O. Warren" .................................. 494,970.54

(f) Operating expenses of Newark Terminal, including depreciation of new terminal facilities ................ 783,488.67

(g) Interest on average net investment of Newark Terminal ....................................... 291,346.92

(h) Direct general expenses of the Tulsa office ...... 15,646.29

(i) Overhead of Tulsa office

    (1) Applicable to operation of the S.S. "Natalie O. Warren" ......................... 114,583.33

    (2) Applicable to the operation of the Norsworthy and Newark Terminals .......... 114,583.33

(j) Transportation cost from the Newark Terminal to customers ...................................... 2,811,726.27

3. The costs of rail transportation, excluding the costs of the Newark Terminal, from the source of supply to the customer for the same period and at the same rate of interest, is $8,712,231.49.

4. Thus, no "savings" accrued to the benefit of the defendants by the use of the S.S. "Natalie O. Warren" in transporting product from the source of supply to the customer when compared with rail transportation.

5. Plaintiff is entitled to all the benefits and total profits resulting to defendants from their tortious acts. Of the $50,000 fee received by defendants from Ligasco for converting dry cargo vessels into LPG carriers, 40% or $20,000 related to "plans" of the S.S. "Natalie O.

Warren" as distinguished from "know-how" of defendants.

6. For the use of plaintiff's "trade secrets", damages under the doctrine of reasonable royalty are fixed at $75,000.

Objections to the Report of the Special Master were filed by both parties. The matter has been fully briefed and argued. I have given long study to the record in this case and consideration of the issues of recoverable damages as argued before the Special Master whose Report is attached as an Appendix. I have decided to adopt the Special Master's Report in full.

Judgment for plaintiff will be given in the sum allowed by the Special Master, i. e., $95,000.

Appendix

Special Master's Report May 10, 1955.

Josiah MARVEL, Jr., Special Master.

To the Honorable Paul Leahy, Chief Judge of the District Court of the United States for the District of Delaware.

Josiah Marvel, Special Master, appointed by the Court by order made and entered herein on the 30th of June, 1951 providing, in part, as follows:

"2. That this cause be and the same is hereby referred to Josiah Marvel, Jr., Esq., as special master, with the usual powers, to take and state an account of the profits, gains, advantages, benefits, and/or damages attributable to the use by the defendants, or either of them, of the Sharp plans, specifications and designs (Plaintiff's Exhibits 49 to 60 inclusive and Plaintiff's Ex. 22) and the theories and ideas set forth in the same, and the vessel known as the 'Natalie O. Warren.'

"3. That the plaintiff recover from the defendants the profits, gains, advantages and benefits of the defendants and/or the damages of the plaintiff attributable to the use by the defendants, or either of them, of the said Sharp plans, and the said economic study and report, and the theories and ideas set forth in the same, and the said vessel known as the 'Natalie O. Warren.'"

now hereby reports as follows:

On June 2, 1952 The Special Master filed a memorandum opinion relating to the theory which serves as the basis for recovery in this action and the procedure to be followed. Attached hereto is a copy of said memorandum opinion, marked Exhibit "A".

Thereafter full and lengthy hearings were held, and upon the evidence and exhibits there presented this report is now made.

It would serve no useful purpose to set out the facts of this action as such appear in the opinion of the Court dated February 27, 1951 and reported at 99 F.Supp. 907.

Plaintiff has approached this accounting phase of the litigation on the theory "The amount of recovery should be based upon a comparison of the cost of Transporting Liquefied Petroleum Gas on the S.S. 'Natalie O. Warren' with the cost of transporting like quantities between the same points by railroad tank cars."

The defendants have advanced a variety of theories which, they argue, lead to the conclusion of no recovery or, at the most, a modest one. In view of the many theories presented by the defendants as contrasted with the simple one of the plaintiff, it appears logical to examine first the arguments of the defendants in order to arrive at my conclusions on the facts and applicable law.

The defendants first assert, "The time defendants' Naval Architects and Engineers may have saved in drafting the plans for the 'Natalie O. Warren' constituted the entire savings, benefits, profits and gains defendants may have derived by any use made of plaintiff's plans and economic study." Defendants argue that since evidence shows "that persons skilled in the art of naval architecture and design could have produced a ship such as the 'Natalie O. Warren' without the Sharp plans." Then "the only advantage defendants derived from any use made of the Sharp plans was the time naval architects and engineers would have saved in the design of the 'Natalie O. Warren' xxx."

In examining this argument it is unnecessary to consider the degree of novelty of the Sharp plans. The Court has already ruled that the novelty required of a trade secret has been met. What is important to examine is the theory and scope of the recovery permitted under the Court's holding. In accordance with my Memorandum Opinion, I still hold that the measure of recovery is not limited solely to the time saved in drafting the plans for the "Natalie O. Warren", for the reason the recovery to which this Court has held plaintiff to be entitled, is for the total benefits to the defendants resulting from their tortious acquisition and use of the plaintiff's "trade secret",

and is not confined to just one element of benefit. This larger scope of recovery permitted appears all the more clear in view of the language of this Court stating "Equitable relief will not be refused simply because plaintiff's trade secret or property right was of such a nature that it might probably be discovered by an accused defendant by independent experiment. A defendant, by its own conduct, may put itself in a position where it loses the advantage of future independent experiments." 99 F.Supp. 907, 913. Moreover, there is nothing in the Court's opinion to indicate that less than the full Equitable relief permitted will be decreed on facts which the Court found did not bar recovery.

■ Having determined that the Equitable relief to which the plaintiff is entitled includes all the benefits resulting to defendants from their tortious acts, I turn to the problem of what standard of comparison, if any, should be selected in computing what benefits resulted from the use of plaintiff's "trade secret" and I consider defendants' next argument that a sea-going barge or a new self-propelled ship with horizontal tanks or, either of them, present the proper standard of comparison to be used in determining what and the amount of savings defendants derived from the use of the Sharp plans. Defendants tendered plans and testimony on these two vessels.

The plans and specifications for the sea-going barge were designed in 1951. This barge has never been built. The plans and general arrangement of the self-propelled ship with horizontal tanks were designed in 1953. This ship has never been built. The Natalie O. Warren was commissioned December 1, 1947. The first question to be considered in this connection is whether a plan for a device developed subsequent to the time of the wrongful use of a trade secret might be a legally sufficient and proper standard of comparison.

The defendants assert that the case of Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 133 F.2d 487, establishes the rule that the above question be answered in the affirmative, and that the facts defendants have presented bring this case within such holding by that court.

An examination of the Gordon Form Lathe Co. v. Ford Motor Co., supra, case does not convince me that its holding conforms to defendants' characterization of it. In that case the Master had before him the problem of choosing the standard or standards of comparison to be applied in making his account. There the infringed patent involved an invention for turning camshafts of automobile engines. The Court held the rule to be, "that where the unlawful use of the patented article or process constituted infringement, the advantage, namely the savings which the infringer derived from using the invention of the patentee or his assignee over what he could derive with any other process or thing which was known prior to the invention constituted the profit which the Gordon Company was entitled to recover. Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326," 133 F.2d 487, at page 492.

The infringed invention in Gordon Form Lathe case was used in three different operations of manufacture, namely, the manufacture of camshafts for (1) Model T Fords, (2) Fordson Tractors and (3) Model A Ford Cars. In applying the above rule the Court held the correct standard of comparison in determining the saving, if any, by the Ford Company in the manufacture of camshafts for Model T Cars was the Ford Shaper which had been used prior to the time of installing the infringing machines. It appeared that "the shaper used to machine camshafts on the Ford Model T cars was mechanically unsuitable to rough machine those on the Model A Ford and the Fordson tractor."

As to the standard of comparison to be used in connection with the camshafts of the Fordson Tractor, the Court held such to be the Landis grinder. In so holding the Court laid emphasis on the fact that the Landis grinder was used by the Ford Company in making camshafts

for Fordson Tractors prior to the use of the infringing machines.

As to the camshafts manufactured for the Model A Ford car it appears these were only manufactured, commencing in 1927, by the infringing machines. Consequently, there was no machine employed to machine camshafts for the Model A prior to the use of the infringing devices which were obtained by the Ford Company in 1924 and used thereafter until 1931.

Without discussing the various devices presented by the parties for selection by the Master as the correct standard of comparison with respect to the camshafts manufactured for the Model A Ford car, I note that the one chosen by the Master and approved by the Court was a machine designed in 1919 but, in fact, never built or put into operation, but concerning which there was evidence that, as redesigned by persons skilled in the art, such could be efficiently used for making Model A camshafts.

Defendants in this case conclude that the Gordon Form Lathe case, supra, defines the requirements of a standard of comparison into which the seagoing barge or the new ship with horizontal tanks fit. With this conclusion I do not agree.

The Court in the Gordon Form Lathe case, supra, 133 F.2d at page 497, stated:

"There are various judicial pronouncements on what is an acceptable standard for comparison on profits. In Mowry v. Whitney, supra, 14 Wall. 620, 81 U.S. 620, 651, 20 L.Ed. 860, in referring to the period of infringement, the court said it must be a device 'then open to the public.' In Sessions v. Romadka, 145 U.S. 29, 45, 12 S.Ct. 799, 803, 36 L. Ed. 609, the court said it must be a device 'known and in general use * * * anterior to the date of the patent.' In Black v. Thorne, 111 U.S. 122, 124, 4 S. Ct. 326, 327, 28 L.Ed. 372, the court said the device must be in 'common use (and) produce the same results.' None of the reported cases, so far as we have been

able to discover, are determinative of the precise question here presented.

"In ascertaining the profits arising from the use of a patented machine by comparison with machines competing with the patentee's conception, we are dealing with practical business matters and our result should not be an unreasonable one which leads to hardship, injustice or absurdity. The standard of comparison set up by an infringer need not to have been used by him at any time and in such cases the evidence of the utility of the device as compared with the invention in suit, may be drawn from persons who have used the two under similar conditions, or from any other source, which is capable of furnishing convincing proof on the point. Tilghman v. Proctor, 125 U.S. 136 at page 152, 8 S.Ct. 894, 31 L.Ed. 664. The proposition is akin to the doctrine of novelty being negatived in infringement cases by prior paper patents or printed publications. In determining standards of comparison for the purpose of ascertaining profits, if the concept of the proposed standard of comparison is full enough and precise enough to enable any person skilled in the art to which it relates to make the thing set up as a standard of comparison, it is sufficient. As applied to the facts of this case, we are of the opinion that the Ford Company was entitled to use as a standard of comparison any aggregation open to the public during the infringing period, even though it required the carrying forward of an original conception, where the change was only in form, proportion or degree, and where the new aggregation performed the original function in substantially the same way as the old, and this is true regardless of whether the specific device was put in actual use. In other words, Ford's field for selection embraces all that was a part of the art at the time it appropriated Gordon's invention whether reduced to actual practice or not. National Tube Company v. Mark, 6 Cir., 10 F.2d 430."

This language of the Court must be read in the light of the facts of that case.

Its rationale appears thus to me. Where a method or a machine had been used by the infringer prior to his use of the patented device, that method or machine is held to be the standard of comparison as was the case in the manufacture of camshafts for the Model T Ford car and for the Fordson Tractor. Where no method or machine had been used by the infringer to accomplish the desired work and result—as was the case in manufacturing camshafts for Model A Ford cars —then the selection of a standard of comparison can be made from devices known to the art at the time of the appropriation of the infringed machine, provided such knowledge was precise and complete. One of the tests suggested by the Court in the Gordon Form Lathe Co. case, supra, as to such preciseness and completeness is the existence of plans or designs similar to prior paper patents or printed publications which negative compliance with the doctrine of novelty required in infringement cases. In the Gordon Form Lathe Co. case, supra, there was such design, made in 1919, long before the use of the infringing machine in 1924, and in the case of camshafts for Model A Ford cars, in 1927.

When the facts of this case are placed against the rationale of the Gordon Form Lathe Co. case, supra, I can only conclude that the sea-going barge and the new ship with horizontal tanks are not acceptable standards of comparison. The designs and plans for both were made years after the Sharp plans were appropriated by the defendants, and in addition the method of transportation used by the defendants to transport LPG from Texas to the northeastern United States prior to its appropriation of the Sharp plans was by railroad, not in any part by water.

Rejecting these proposed standards of comparison, I also reject the argument that the sea-going barge should be the standard of comparison after June 5, 1951, the date of the General Arrangement Plan of the barge. The record shows that even after the sea-going barge plans were designed, the defendants choose rail transportation as the alternative to part rail and part water transportation from Texas to the northeastern United States.

The plaintiff proposed as the standard of comparison railroad transportation, a method available at the time of the appropriation by the defendants of the Sharp plans and in fact employed by defendant in transporting LPG from Texas to the northeastern states.

The defendants in asserting that such standard of comparison is not a proper one contend that the LPG shipped on the "Natalie O. Warren" would not, for economic reasons, have been shipped by rail. They argue that economic factors created a barrier which would render it absurd, under our profit-seeking economic system, to ship LPG by rail to the east coast from Texas. Defendants cite no cases in support of their economic argument. I find nothing in the record that makes the case of Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664, and the case of In re Cawood Patent, 94 U.S. 695, 24 L.Ed. 238, not applicable here. In fact, I find them controlling. The over-all operations of the defendants in the petroleum industry, its size and variety of products, are all part of the picture presented in this case. The record is clear defendants were seeking an outlet for LPG in the northeastern states and once having obtained a credible share of the market, primarily due to the operation of the "Natalie O. Warren", defendants undertook to maintain and develop further this market, by all means available, even during the period when the Newark Terminal was out of operation by reason of the fire in July 1951. The record is not clear as to the economic effect the sale of LPG had on the other operations of the defendant in the petroleum business. It could well be that profits resulting from the sale of other petroleum products produced in the manufacture of higher or lesser amounts of LPG would more than offset any loss occasioned by the alleged unprofitable sale of LPG. The fact that defendants

claim no profits in their LPG business in the northeastern states and yet to this day continue to operate it, lends some weight to the inference that in their over-all petroleum business the economic barrier they attempt to set up against the use of rail transportation would not have, in fact, ever existed to the extent they claim.

Moreover, under my analysis and understanding (supra Page 6) of the principles of the Gordon Form case, Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 133 F.2d 487, no support is supplied to defendants' argument that rail transportation cannot be a standard of comparison because of the economics of the situation. On the contrary, that case, as pointed out, teaches that if a method or device was used by the infringer, if in fact one was used, prior to the use of the infringing method or device, then it is a proper and correct standard of comparison to apply.

I, therefore, conclude a comparison between the two methods of transportation, on one hand by rail, on the other by part rail and part water, to be the correct approach in determining what benefits defendants obtained in using the Sharp plans.

In making such comparison plaintiff maintains that the comparative costs of transportation must be limited between the two points of travel of the "Natalie O. Warren" namely, Norsworth, Texas, and Newark, New Jersey. In considering this contention it is necessary to examine for what purposes transportation' of whatever nature was required. Defendant Warren Petroleum Corporation was and is a manufacturer and marketer of LPG. It has been in that business since 1922. With the increase in production and use of LPG, Warren Petroleum Corporation looked for new outlets for its product. In June of 1944 Warren commenced making inquiries as to the possibilities of water transportation of LPG from a storage terminal at Norsworthy, Texas, to points along the eastern coast and to foreign ports, as a link in the total transportation required to get the product from the source to the consumer. It would serve no useful purpose to recite in detail the course which such inquiries took. The obvious desire was to utilize water or any other transportation which would obtain a larger market for its product, namely, more sales. In order to obtain such market and to effect such sales, it was necessary to move the product from its source of origin to its destination. As stated above, prior to the construction of the "Natalie O. Warren" rail movement from Texas to the northeast was employed by defendant Warren Petroleum Corporation. Consequently, it is the comparative costs of such movements, by transportation involving the use of the "Natalie O. Warren", and by transportation using rail alone that concern this portion of this report. Accordingly, I now proceed to such comparison from the source of origin to the destination.

Plaintiff contends that the source of origin was the Terminal at Norsworthy and the destination was the Terminal at Newark. Plaintiff argues that the Sharp plans and economic study contemplated solely water transportation of LPG as a separate and independent transaction, and consequently the cost of movement of LPG is limited to a comparison between rail and water transportation between the two ports between which the "Natalie O. Warren" plied, namely, Norsworthy, Texas, and Newark, New Jersey. The fact that defendant Warren Petroleum Corporation caused defendant Warren Maritime Corporation to be formed lends some weight to this argument that water transportation of LPG must be separated from all other transportation and from the general business and marketing facilities required in selling defendants' products. Warren Maritime Corporation was incorporated in October 1946 for the purpose of carrying on a general shipping and forwarding business, and was the wholly-owned subsidiary of Warren Petroleum Corporation. Warren Maritime Corporation was dis-

solved June 30, 1952. During its existence it held title to the vessel "Natalie O. Warren" and the terminal at Newark. Warren Petroleum Corporation owned the lease and later the land and buildings of the Norsworthy Terminal, the pipe line leading thereto and all railway tank cars and trucks used in delivering LPG to Norsworthy and elsewhere. Warren Maritime Corporation did not pay any of the charges for transporting any of the LPG which was delivered to the Norsworthy Terminal. It further appears that Warren Petroleum Corporation paid these charges, whether made by tank car, truck or pipe line, of transporting LPG from the plants of origin to Norsworthy, and that such LPG was thereupon sold by Warren Petroleum Corporation to Warren Maritime Corporation, which transported the same to Newark, where it was unloaded and resold to Warren Petroleum Corporation. The latter then sold all of such LPG to its customers f. o. b. Newark, New Jersey.

This examination of the actual operations of the two defendants with respect to LPG appears to support the plaintiff's view that the water transportation between the two terminals was a separate and independent transaction from all other methods of transportation employed in hauling product from its source to the consumer, and that a comparison of costs of the two methods of transportation must be limited to the actual part Warren Maritime Corporation played. Furthermore, the charter of Warren Maritime Corporation which was filed at or about the time the defendant Warren Petroleum Corporation definitely decided to go ahead with the conversion of a dry cargo vessel to a 100% LPG carrier provided, in its terms, for an operation and business similar to that suggested by the Sharp plans and economic study. There is nothing in the charter authorizing Warren Maritime Corporation to act other than in the role of operating vessels in a dock-to-dock business with all the general powers incidental to such a shipping and for-

warding operation. In spite of the manner in which the various steps of transporting LPG from the plant of origin to the ultimate customer in the northeastern states were painstakingly done, the defendants insist that the over-all picture be looked upon, and in arriving at the cost of the total transportation required, argue that the following items make up the real and true total costs to be compared with rail costs.

1. Transportation cost from plants to Norsworthy Terminal.

2. Norsworthy Terminal operating expenses.

3. Depreciation of Norsworthy Terminal.

4. Interest on Average Net Investment in Norsworthy Terminal.

5. Interest on Investment in Land at Norsworthy Terminal.

6. Cost of operating Tanker SS "Natalie O. Warren".

7. Depreciation of Tanker.

8. Interest on Average net Investment in Tanker.

9. Cost of Operating Newark Terminal.

10. Depreciation of Newark Terminal facilities.

11. Loss from fire at Newark Terminal.

12. Interest on Average net Investment in Newark Terminal facilities.

13. Tulsa Office Direct General Expenses.

14. Tulsa Office Overhead

(a) Applicable to operation of Tanker.

(b) Applicable to operation of Norsworthy and Newark Terminal.

15. Cost of product Lost in Transit, which would not have been incurred in tank car shipments.

16. Transportation cost from Newark Terminal to customers.

As far as I can gather from the record, of the above-mentioned items of cost, Warren Maritime Corporation was charged with the costs incidental to the operation of the Tanker SS "Natalie O.

Warren" and the costs of the operation of the Newark Terminal, including the Tulsa office overhead expenses in connection with the Tanker and Newark Terminal operations. The other items of cost listed above apparently were charged to Warren Petroleum Corporation. Such method of accounting and such method of operation in the light of the Sharp plans and economic study certainly fortifies the opinion of the Court that defendants appropriated the "trade secret" of the plaintiff. In form, an independent and separate water transportation system was set up by Warren Petroleum Corporation as outlined in the plans and study of the plaintiff. But I do not believe that such separation of payments alone made by a corporation and its wholly-owned subsidiary finally determines the limits within which the comparison between two types of transportation costs are bound.

As pointed out, Warren Petroleum Corporation was seeking an enlarged market for LPG, and its problem was to solve all of the difficulties incident to breaking into the potential market in the northeastern states. The main problem in that connection was transportation, and that included all its aspects, from the source of supply to the ultimate consumer. Warren Petroleum Corporation was and is engaged in the manufacture, distribution and sale of petroleum products and to the extent transportation is necessary to accomplish its purposes it engages in the transportation business. Its use of the Sharp plans was not primarily to put itself in the water transportation business. It did not hold itself out as a common carrier. It used the Sharp plans to further its general purposes and water transportation was only incidental to its main business of seeking outlets for its products. Water transportation by a vessel of the design of the "Natalie O. Warren" filled the largest but only one gap in the transportation problem to get the product to the northeast. Consequently, I am of the opinion that the approach must be to consider the items of cost proposed by the defendants and to accept or reject them. The items are first considered, and thereafter as to the ones I accept I will then determine what in my opinion is the correct amount in each instance. In so doing I will, for the time being, disregard the corporate entities of the two defendants, treat them as one and likewise treat the books and accounts as one.

1. Transportation cost from plant to Norsworthy Terminal.

Treating the two defendants as one enterprise engaged in all aspects of the petroleum business, it is obvious that included in the marketing of the various products transportation and distribution are necessary items. This is particularly true here in the case of LPG where a new potential market was distant from the source of manufacture. It was the capture of this market or a substantial portion thereof that was sought. And to do so, the product had to be delivered. For purposes of this discussion it appears to me to be unimportant as to the person who pays the transportation costs. Whether the product is purchased f. o. b. the plant of manufacture or f. o. b. a storage facility nearer the ultimate destination, payment of all transportation costs must be made. Neither custom of the trade nor complicated accounting methods, whether motivated by tax laws or otherwise, can erase the fact that no matter under what name it is labelled, whether buried or not, transportation costs, commencing with the movement of product from the source of manufacture, are there and must be paid.

The record is clear that the interest of Warren Petroleum Corporation primarily lay in the sale of petroleum products, but it understood that such sales involved a transportation problem, and for that purpose it had built up a fleet of trucks and railway tank cars. The fact it used such fleet in transporting LPG from the source of manufacture to Norsworthy Terminal did not do away with transportation costs. Nor did it mean Warren was primarily engaged in the transportation business. It used its

trucks and tank cars in that haul not as a common carrier but as a means of getting its product to market. In just the same way did it use the vessel. It was not merely water transportation that interested Warren, but all types of transportation which would bring its products to the consumer. It was this over-all picture in which water transportation fitted as a part, but only as a part, and to make up the whole, all parts must be included. I, therefore, conclude that any comparison of transportation costs from the source of manufacture to the ultimate destination, which is what even the plaintiff knew was the problem of Warren, must include that portion of transportation costs arising from the haul of product from the plant of manufacture to the Norsworthy Terminal.

2. Norsworthy Terminal Operating expenses; and

3. Depreciation of Norsworthy Terminal.

It is not necessary to dwell at any length on this subject. True, Norsworthy Terminal was contemplated long before the Sharp plans came to the attention of the defendants. It was constructed as a storage and terminal facility for water transportation. But it is clear that the expenses of loading, unloading, temporary storage and other services performed at such a marine terminal are all part of the costs of transportation, and must be included in the over-all picture. Once it is concluded the terminal is part of transportation, then depreciation thereon is a proper item of cost.

4. Interest on average net investment in Norsworthy Terminal; and 5. Interest on investment in land of Norsworthy Terminal will be considered together as each is bound up in defendants' contention that I must take into account interest on the original investment, less depreciation. The start, therefore, must be whether interest on capital invested is an allowable item and a proper credit. Plaintiff argues that no consideration can be given to this claim of interest on investment except possibly to that of the amount invested in the vessel, the

"Natalie O. Warren", because we are only concerned with water transportation. At this point I do not accept that argument, for as previously pointed out, I am now considering the over-all picture of the problem of transporting LPG from the source of supply to the ultimate destination, and facilities to load the vessel for its journey to the market in the northeastern states were required to accomplish this over-all transportation problem.

Plaintiff next contends that "interest on invested capital as a credit in reduction of profits is allowed only where the infringement was not willful and deliberate." I am not satisfied that the case of Duplate Corp. v. Triplex Safety Glass Co., 3 Cir., 1935, 81 F.2d 352, holds in strict accordance with plaintiff's view set out above. In that case the Court found no willful and deliberate infringement, but in so finding made no ruling as to the effect of a willful and deliberate infringement on the allowance of interest. I am inclined to the view expressed in Sutton v. Gulf Smokeless Coal Co., 4 Cir., 1935, 77 F.2d 439 to the effect that whether the infringement was willful and deliberate is immaterial in allowing the necessary and reasonable expenses of the business. A willful and deliberate infringement may and does have effect in some cases as to the amount of recovery, but I do not agree that such conduct should prevent the allowance of the reasonable and necessary business expenses in arriving at a comparison of two methods of transportation, as such would be a penalty too punitive in nature for a court to approve when seeking to do equity.

Plaintiff next asserts "where interest on invested capital is otherwise allowable as a credit against profits, it may be allowed only on that capital which is actually employed in the infringing operation, and not on capital employed in non-infringing business." In substance plaintiff sets out the ruling of Western Glass Co. v. Schmertz Wire Glass Co., 7 Cir., 1915, 226 F. 730. With that case I agree. The question is how does that ruling apply to the facts presented here.

Under the over-all view of the facilities required for transportation from the source to the destination, the vessel, the "Natalie O. Warren", cannot be held to be the only capital engaged in the infringing business and to the extent the Norsworthy Terminal was a part of such transportation, I hold that it was engaged in the infringing business.

Plaintiff as a final point maintains "Interest on invested capital, where otherwise allowable, is allowed only as a credit or offset against profits, where profits are used as the measure of plaintiff's recovery, and such interest cannot be allowed as an offset or credit where the standard of comparison is used as the measure of plaintiff's recovery."

I attach no significance to the apparently interchangeable use of the words "profits" and "savings" by various courts in arriving at the benefits obtained by the wrongful use of an infringing device. What I believe plaintiff's point goes to is whether in determining the savings resulting from the use of one method over another the item "Interest on Investment" should be included as an item of cost. In the Gordon Form Lathe Co. v. Ford Motor Co. case, 6 Cir., 133 F.2d 487, the Court in arriving at the savings resulting from the use of the infringing machines apparently did not include interest on investment in establishing the costs expended in the camshaft turning process. However, the matter of such inclusion has been raised in this case and such specialized cost treatment must be considered.

In the accounting world there are three schools of thought: One, that interest should be included in cost; another that interest should not be included in cost; and a third to the effect interest is included in cost for statistical and comparative purposes and is not included for inventories and income. Defendant adopts this third view, or a compromise between the opposing schools of thought that interest is a cost or is not a cost. The testimony on this subject impressed me as confining this third method of accounting to computations that deal with future transactions, such as the desirability of renting or owning facilities. In other words, such method is used in making preliminary estimates upon which management will determine which course of action it will undertake. After the course of action is determined then a further determination must be made as to whether such interest will be included in cost in the day to day accounts. There are reasons on each side and they are set out in Lawrence, Cost Accounting, 3rd Ed. Pages 333–339.

Whether defendant Warren Petroleum Corporation ever had such a preliminary estimate of comparison of rail alone and water and rail transportation made and, if so, whether it included interest as cost does not appear from the record. Certainly interest as cost does not appear in its annual reports nor on the books and records of the company is it reflected as such. What does appear on the books and records are figures representing investment. Defendants, for the purposes of this action, have taken such investment figures and calculated separately such interest as a cost. Thus, it appears the accounting practice of the defendants follows that of not including interest as a cost on their books and records. Defendants claim it should be included as an item in a comparison of two types of transportation on the ground that whenever there is a difference in the amount of investment required to accomplish the result, an economist would include items of interest as a cost in making such comparative study.

Plaintiff does not entirely disagree with this view, if such comparison were for the purpose of making a business decision for future action by a company, but it says that as a matter of law interest as a cost can only be included where a plaintiff seeks the recovery of profits resulting from the sale of a product produced by an infringing device. If the recovery sought is not profits from sales, the plaintiff argues, but for savings which are determined by a comparison with another available method of accomplishing the same result, then interest as a cost cannot be included. It

points out that the cases cited by defendants allowing interest on investment all involved an accounting to determine the profits from sales, and that none were standard of comparison cases. The reason such interest on investment is included in the cases cited by defendants is to determine the cost of producing the product by the infringing device or method, in order to determine the profit resulting from the difference in such cost and the amount of the sale price. In short, such interest is included as a cost item. If interest is recognizable as a cost item by such cases, I can see no reason to exclude it when two alternate methods are considered, merely because there are two methods. The comparison is between two separately calculated figures consisting of various items of cost, and the sole legal problem is whether all such items are proper items of cost.

The courts have held interest on investment is such a proper item and with such holdings I agree. While nothing in Gordon Form Lathe Co. v. Ford Motor Co., supra, appears to show that the Ford Company claimed interest on its investment in the infringing method, that does not lead to the conclusion such is not an includable item. The fact that the Ford Company used the infringing device at a reduced capital expenditure than theretofore may be the reason the item, interest on investment, was not brought by it to the Court's attention. Here, however, such item has been brought to my attention and I hold, whether the ultimate purpose be to determine "profits" or "savings", where the basic question is the determination of cost, that interest on investment is a legally and properly includable item.

In view of my opinion relating to the above items which I have concluded should be included in arriving at the cost of transportation, the following items for the reasons above set out are likewise includable: 6. SS "Natalie O. Warren" operating expenses, 7. Depreciation of tanker, 8. Interest on average net investment in tanker, 9. Newark Terminal expenses, 10. Depreciation of New Terminal facilities and 12. Interest on investment in Newark Terminal facilities.

I now take up the remaining items advanced by defendants to be part of the cost of transportation, as such was performed by defendants.

In July 1951 a fire caused considerable damage at the Newark Terminal, and loss resulting therefrom is urged by the defendants to be included as an item of cost of transportation. The record is quite clear that this was not an operating loss. It appears to me the best characterization of it was the phrase "capital loss", but it does not follow that because such loss could be charged off against income in Federal income returns that it is an item of cost of transportation. The temporary loss of a fixed asset used as a transportation facility may result in higher transportation costs due to rerouting of traffic or use of other facilities, but the loss itself of the fixed asset is not a part of such transportation costs. The fact that it caused or brought about higher transportation costs (which this record does not show) does not make the fire loss itself an item making up such costs.

I therefore exclude this item as part of the cost of water transportation.

The item "Tulsa office direct general expenses" appears to be a properly includable item and therefore is accepted as such. I reach the same conclusion as to "Tulsa office overhead applicable to the operation of the Tanker and applicable to the operation of the Norsworthy and Newark Terminals".

All parties agree cost of product lost in transit is an includable item of transportation costs. This seems clear particularly in view of the evidence that the amount of cost of transportation is determined by the amount of the product delivered to the destination, and I hold cost of product lost in transit to be an includable item.

The remaining item urged by the defendants to be included is the transportation cost from the Newark Terminal to customers. It appears that de-

fendant Warren Petroleum Corporation, when it undertook to explore and plan the means of obtaining a part of the market for LPG in the northeastern states, considered an arrangement whereby it would deliver by ship the product to the east coast, where it would be purchased and marketed by an independent dealer. If such had been done, the destination and the customer would have been at the unloading point of the vessel. The reasons for substituting Warren itself for the proposed dealer and for constructing a Terminal on the east coast owned by it, do not appear and it is unimportant to speculate as to why such was done. In form, the original plan was kept. As stated before, the LPG was sold by Warren Petroleum Corporation to the Maritime Corporation at the time the LPG was loaded on the "Natalie O. Warren" at a price equal to the price paid plus the transportation costs to Norsworthy plus the pro-rata portion of the Norsworthy expenses. The title of the LPG was transferred by the Maritime Corporation to the Petroleum Corporation when it was taken out of the Newark Terminal at a price equal to what Petroleum Corporation received from the customer, less 1/8¢ per gallon for handling (this later was changed to 5% of the sales price). But in all these steps Warren, by whatever corporate entity employed, was dealing with itself and in substance the ultimate delivery was not made until the destination of the ultimate customer was reached. My reasons for applying the costs of transportation from the plants of manufacture to the Norsworthy Terminal equally apply here, and I conclude such transportation costs from the Newark Terminal to the customer is an item in the total water and rail transportation expense.

Having arrived at the items which constitute the costs of water transportation, I proceed to consider the amount of each.

Defendant asserts that from December 1, 1947 through June 30, 1952 the transportation cost from plants to the Norsworthy Terminal is the sum of $829,603.-47. This sum is made up of freight rates charged by Warren's trucks, by Warren's pipe line, and the railroads. In the case of rail freights, defendants have added the operating expense of the estimated number of tank cars owned by Warren required to haul the product shipped by tank car, less the estimated mileage earnings received from the railroads. In estimating the operating expense of the tank cars, defendants had taken, during each period involved, the average number of LPG tank cars owned by Warren and calculated the average net investment per car at the rate of 6% per year. In a like manner, the average depreciation of LPG tank cars has been calculated and also the average tank car operating expense per car.

On the other hand, plaintiff estimates such total costs to be the sum of $658,-683.97.

As to the truck and pipe line costs, the difference between the parties is slight until there is taken into consideration that defendants, in calculating such costs, have added interest and overhead to these charges. On examination of the record relating to these truck and pipe line costs, I conclude that the actual costs only should be considered and I therefore adopt the figures appearing in plaintiff's exhibit BB as the starting point in arriving at these total costs. Defendants have employed these same figures in defendants' exhibit 561. The difference in the total of these two exhibits lies, as pointed out above, in that the defendants have included the two items, one overhead and the other, interest on investment. Both of these methods of transportation, the trucks to some extent and the pipe line, involved the use of defendants' own equipment, and it appears to me that overhead is a cost of doing business and operating equipment and should be included as an item of cost. This seems all the more necessary when such total cost is to be compared with the cost of another transportation operation whose costs likewise include overhead.

Defendants claim overhead in the amount of $10,000 per year as to the trucks and $12,000 per year as to the two pipe lines. While there is no fixed formula to establish the amount of overhead, a variety of factors are taken into consideration. When comparing the investment in and the operating expenses of trucks with that of the pipe lines, with that of the terminals and with that of the tanker "Natalie O. Warren", there should be some corresponding difference in the amount of overhead applicable to each business operation. Accordingly, I find the yearly amount applicable to the truck transport as overhead the sum of $4,000, $4,000 to the Ventura pipe line and $1,000 to the Baytown pipe line.

I have already held interest on investment is an includable item of cost. Defendants claim such should be at the rate of 6%. Plaintiff, while denying such is a cost item, asserts that if such be included, then the rate should be at no more than 3½%. It is not necessary to go into the reasons advanced by the parties in support of the rate of interest advocated by each. The theory, as I understand it, of including interest on investment as a cost item is that a certain rate of return is inherent in capital when safely invested but that anything above that rate of return is not earned by the capital itself but by the investor. Thus, if money can be invested safely elsewhere, then this safe rate of interest is an expense to the business in order to secure the capital. There are thus two parts to the return on capital, (1) that which a safe investment provides and (2) that which the investor receives for the risk of loss he undertakes. The rate of interest on investment, in my opinion, is limited to the first part. The question then is what is the return on a safe investment? Many factors determine this, but one of the most controlling is the supply and demand of money. During all the period involved in this case the policy of the Government has resulted in cheap money. In the light of the money market I conclude that 3½% is the rate of return on a safe investment, and this rate should be applied to the net invest-

ment in truck and pipe line facilities as an item of cost.

With respect to the costs of rail transportation to the Norsworthy Terminal, two positions are presented as to the manner of calculating railway costs. There is no dispute among the parties as to the freight charged by the railroads. The dispute arises as to how the expenses of the tank cars which were supplied by Warren should be estimated. Plaintiffs contend the average cost per mile of the entire tank car fleet of defendant Warren should be multiplied by the miles traveled to arrive at the cost. Defendants make their estimate based on the estimated number of tank cars required and the cost of maintaining such cars in such service. The record shows no assignment of specific tank cars by Warren to this operation from plants to the Norsworthy Terminal. Consequently, there is nothing on the books of the defendants to show the mileage earnings of each individual tank car. It thus appears that the books of the defendants do not show the expenses and the earnings of operating the tank cars employed in the haul from the plants to the Norsworthy Terminal as such. They must be estimated from other figures appearing on the books.

After such an estimate, I conclude that the method used by defendants and as shown on its exhibit 530 gives a truer picture of these expenses, except for the item of interest on investment, and as to that I conclude the proper rate to be 3½%. The use of the average cost per mile of the entire tank car fleet of Warren as suggested by the plaintiff does not accurately reflect the actual costs of this short haul operation. My adoption of the defendants' method of estimating these costs is fortified by the answer of defendants to plaintiff's interrogatory 36 which requested information as to the cost of such transportation. This answer sets forth the freight charges plus the charges made for use of Warren-owned tank cars, trucks and pipe line and the total costs therein set forth more nearly approximate the defendants' estimate than that of plaintiff. It is not

logical to conclude Warren would pad its charges to its own wholly-owned subsidiary when it was to repurchase the product after the sea journey for ultimate sale to its customers.

The Norsworthy Terminal operating expenses are next considered. The parties are in agreement as to the amount of these expenses with the possible difference as to the items of overhead and interest on investment. I have already concluded overhead is an item of cost and likewise interest on investment at the rate of 3½% with respect to the Terminal and land.

The cost of operating the SS "Natalie O. Warren" presents no difference except as to the interest on investment and an item for accrual for repairs. I have already determined that interest on investment at the rate of 3½% is an allowable item. As to the accrual for repairs, plaintiff points out such an item was not set up on the books of defendants until after this suit was commenced. It further argues that this accounting should only concern actual costs and not speculative estimates. It concludes that in arriving at the operating costs of the vessel only those amounts actually expended on maintenance and repairs should be considered. On the other hand, defendants contend setting up such a reserve accurately shows the current expenses for a given period, particularly so when it was known the vessel would require an expensive overhaul every four years. I incline toward the view of the plaintiff. I am seeking to ascertain the actual costs of water transportation from the source of supply to the ultimate consumer, and in so doing I am of the view accounting practices, no matter how attempted to be justified, should not change the basic method of the search for the answer to the question, "How much did the water transportation cost?" Perhaps, if defendants' estimate of the reserves required for such an accrual account had been more in balance with actual paid out expenses, and such account had not been established after this suit was commenced, then their argument could have been

more persuasively presented. But even in such event it would not be sufficiently persuasive to alter my conclusion, which I now make, that only actual paid out expenses should be considered in ascertaining the cost of repairs and maintenance of the vessel. Accordingly, to the extent such item exceeds the actual expenses, it is disallowed. The record shows this amount to be $142,818.48.

I now consider the differences as to the cost of operating the Newark Terminal. One difference between the parties as to this cost is the item of accruals for repairs. This, as with the accrual account of the vessel, was not established on the books until after this suit was commenced. What I have concluded as to the similar item relating to the cost of operating the vessel applies here and I disallow this item in the amount of $17,884.26.

I have already held the fire loss item is not an allowable item of cost. The only remaining item of difference is that of interest on investment. For the reasons heretofore set out, I hold such is an includable item of cost at the rate of 3½%. Plaintiff increased the operating costs of the Newark Terminal by transferring thereto the sum of $6,465.49 from Tulsa office direct general expenses. This item relates to New Jersey franchise taxes and signs for the Terminal. This does not bring about a difference in the overall result. But with respect to the Tulsa office direct expense applicable to the tanker there remains one disputed item. That is the cost of the two scale models of the "Natalie O. Warren" in the amount of $4,150. In view of the manner of operation of the vessel by the two defendants as a private carrier, I fail to see the justification of advertising expenses. This item in the amount of $4,150 is therefore not allowed as an item of cost. As to the Tulsa office overhead applicable to the tanker, all parties agree that this item in the amount of $25,000 per year is proper. The defendants claim a similar amount as proper overhead charges for the Norsworthy and Newark Terminals. For the reasons hereinabove set forth, I hold overhead

to be a proper item in the costs of operating these two terminals and I find the sum of $25,000 per year as reasonable.

Defendants claim as an item of transportation costs that of the transportation costs from the Newark Terminal to the customers. I have already held such to be an includable item. Plaintiffs offered no evidence as to such costs. Although the freight costs from the Newark Terminal were paid by customers, the defendants offered their estimate of such costs, which was not directly challenged by plaintiff. I have already examined the two methods of estimating rail costs submitted by the parties with respect to the haul from the plants of manufacture to the Norsworthy Terminal, and I concluded that the method of arriving at the estimate submitted by the defendants was the correct one to adopt. I, therefore, adopt the method of the defendants in estimating the transportation costs from the Newark Terminal to the customers.

In accordance with my conclusions, I have calculated the cost of transporting the product from its source to the customer. With respect to the rail transportation costs, I have used the method of estimate of the defendants, but recalculated them, using $3\frac{1}{2}\%$ as the rate of interest on investment. I find such costs during the seven month period ending June, 1948, and the fiscal years to June, 1952, to be as follows:

(1) Transportation cost from plants to Norsworthy Terminal Defendants' Exh. 561, revised including subtraction of $3,766.18 being the amount of additional mileage earnings based on readjusted number of miles. — $ 763,891.20 (1)

(2) Norsworthy operating expenses, including depreciation (Plaintiff's Exh. BB) — 496,885.21 (2)

(3) Interest on investment Norsworthy Terminal (Plaintiff's Exh. JJ) — 189,972.06 (3)

(4) Tanker operating costs (Plaintiff's Exh. DD, adjusted as to accrual account) — 3,032,174.65 (4)

(5) Interest on Investment, Tanker (Plaintiff's Exh. JJ) — 494,970.54 (5)

(6) Cost of operating Newark Terminal (Plaintiff's Exh. EE) — 783,488.67 (6)

(7) Interest on Investment Newark Terminal (Plaintiff's Exh. JJ) — 291,346.92 (7)

(8) Tulsa Direct Office expenses (Plaintiff's Exh. EE) — 15,646.29 (8)

(9) Tulsa office overhead

    (a) Tanker — 114,583.33 (9a)

    (b) Terminals (Defendants' Exh. 530) — 114,583.33 (9b)

(10) Product Lost in Transit (Defendants' Exh. 530) — 52,099.77 (10)

(11) Transportation, Newark to customers. (Defendants' Exh. 530, adjusted) — 2,811,726.27 (11)

(12) Total Transportation costs         $9,161,368.24 (12)

Such costs are now compared with the method of transportation employed prior to the use of the vessel "Natalie O. Warren", namely rail transportation from the source of supply to the customer. I have recalculated such estimate as submitted by Defendants' Exhibit 530 schedule 36 so as to use my rate of 3½% on interest on investment in tank cars and I find such estimate, for the period involved, to be $8,712,231.49. In adopting such figure as such rail costs I have not included therein as a part of such costs the Newark Terminal. The evidence satisfies me that the Newark installation, whether called a terminal or a storage facility, would not be employed in rail transportation from the source in Texas to customers in the northeast. Just as the costs of the Norsworthy Terminal were apportioned as to the amount of product loaded on the "Natalie O. Warren", just so the costs of the Newark Terminal would be apportioned as to the amount of throughput of product involved in rail transportation. But where there would be no throughput, there would be no apportionment. From all the evidence, it is clear the Newark Terminal would play no part in the method of transportation I have selected to be the standard of comparison.

My conclusion is there has been no showing that "savings" in any amount accrued to the benefit of the defendants by the use of the "Natalie O. Warren" in transporting product from the source of supply to the customer when compared with rail transportation.

■ As I have concluded plaintiff is entitled to recover "all" benefits received by the defendants by the use of the Sharp plans and study, I next examine whether, apart from "savings", such benefits existed.

In February 1949, defendants entered into an agreement with Ligasco Supply and Transport S. A. and Socony-Vacuum Oil Company, Inc. whereby defendant agreed to supply 'processes, working plans, designs, specifications, results of

experience and techniques developed in the conversion of LPG carrier, SS "Natalie O. Warren", for the purpose of converting one or two dry cargo vessels into LPG carriers. For such services defendant received a fee of $50,000. Defendants assert that the greater part of the services rendered under this contract was the engineering "know-how" and that the plans of the "Natalie O. Warren" were a lesser contributing factor to the fulfillment of the contract. Defendants then assert an apportionment of the entire fee between the contributions of each of the two parties must be made. In making such an apportionment, defendants contend that first a division must be made as between the "plans" and the "know-how". Then a second apportionment must be made as to the "plans" and a determination made as to what extent plaintiff's contribution, namely the Sharp plans, made possible this profit. On the other hand, plaintiff contends the defendants are not entitled to the benefits of the doctrine of apportionment.

I am satisfied the facts of this case, as they relate to the Ligasco contract, present a situation where the doctrine of apportionment is applicable. I follow the holding of Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, and turn to the problem of determining what the facts show as to how this $50,000 fee should be distributed. Considering the evidence submitted as to the services performed under the Ligasco agreement, I find that 40% thereof related to the "plans" as distinguished from defendants' "know-how", obtained from the LPG handling business or engineering services which were rendered in advising as to the conversion of two dry cargo vessels into LPG carriers.

The next step is to ascertain whether there should be an apportionment between the parties as to the "plans". Defendants contend they incorporated into the "Natalie O. Warren" twelve important features, not found in the Sharp

plans, that contributed to the safety and economy of the vessel. In fact, defendants contend these improvements contributed 95% to the value of the vessel as a carrier of LPG, while the plaintiff with its Sharp plans made a contribution of but 5%. Plaintiff, on the other hand, points out that when the full extent of the conception of the Sharp plans is recognized, then the doctrine of apportionment does not come into play. Plaintiff further says that the basic idea contributed by it was for converting a dry cargo vessel to a vessel for the carriage of a 100% cargo of LPG and adds that such was not limited to vertical tanks extending through the deck alone. It must be kept in mind that I have already found that no savings resulted to the defendants in comparing the two methods of transportation of LPG from the source of supply to the customer in the northeast. Even defendants' twelve features incorporated into the "Natalie O. Warren" did not result in any savings in the over-all transportation operation. Without such savings the doctrine of apportionment is not applicable. The question, then, is does the receipt of $50,000 under the Ligasco contract result in profits which the law demands be apportioned as to the contribution made by the two parties to the "plans", as well as to the "know-how" which was supplied? The "know-how" supplied solely by the defendants under this contract related largely to their experience in LPG handling and consisted of advice and engineering services based on matters apart from any of the twelve features incorporated into the "Natalie O. Warren". The record places at a minimum the use of the detailed "plans" of the "Natalie O. Warren" in the conversion of the two dry cargo vessels to LPG carriers under the Ligasco contract. I conclude from this evidence that it was the basic idea of the conversion of a dry cargo vessel to a vessel for the carriage of a 100% cargo of LPG that was supplied by defendants rather than any detailed "plans" including the twelve features

added by defendants. This basic idea was the contribution of the plaintiff and any profits resulting therefrom belong to it. Certainly, as pertains to the Ligasco agreement, the defendants have failed to carry the burden in presenting evidence looking toward apportionment. I find the profits resulting from the idea contributed by the plaintiff to be 40% of the $50,000 Ligasco fee and accordingly plaintiff is entitled to recover the sum of $20,000.

As heretofore pointed out, the plaintiff is entitled to all the benefits flowing to the defendants resulting from their tortious acquisition and use of plaintiff's "trade secret". As was held in Gordon Form Lathe Co. v. Ford Motor Co., 133 F.2d 487, plaintiff is entitled to recover the savings realized by defendants or damages because of the use of the "trade secret". Even though I have found no savings were realized by defendants, that in my opinion does not foreclose plaintiff's right to damages. In fact, the District Court has directed me to determine such damages. The manner of determining such damages, in view of the facts presented by the record before me, is to resort to the doctrine of reasonable royalty. Even though the record contains no direct evidence as to the amount of reasonable royalty to which the plaintiff is entitled, there is sufficient evidence as to the nature of the "trade secret" appropriated by defendants, the extent of its use and the results of its use, for a determination of what such amount should be. Defendants constructed the "Natalie O. Warren" from the plans and basic ideas of the plaintiff for the conversion of a dry cargo vessel to a vessel carrying 100% cargo of LPG, and since its construction have used the vessel in hauling LPG from a Texas port to ports on the northeast coast. As a result of such use of this vessel in its transportation system, defendants have been able to accomplish one of its primary purposes of obtaining a large share of the LPG market in the northeastern states. In fact, the record

shows that defendants obtained a market in the northeast for its product that has brought in gross receipts of approximately $10,000,000.

This report is not concerned with whether a profit was made by defendants from such gross sales. The fact is a new market was obtained by defendants due to a new method of transportation suggested by plaintiff's plans and ideas. The further fact is the defendants continue to this day to use this method of supplying the market in the northeastern states. They have not given it up and it can only be concluded defendants consider it important to maintain this outlet for their product. I have already remarked that there is no evidence as to the result on defendants' over-all petroleum business that makes it desirable to continue to supply LPG in large quantities to this market in competition with refineries located in the northeast, and I do not speculate as to whether the varied petroleum products resulting from the manufacture of a higher or lesser amount of LPG could be sold at a price that would more than offset any loss which LPG sales might bring. The fact remains that defendants have used plaintiff's "trade secret", together with its organization and its other facilities, to create a $10,000,000 market.

They have used since December 1, 1947 and are still using the "Natalie O. Warren", a vessel whose construction was modeled on the plans and ideas suggested by the plaintiff, and apparently will continue to do so. Considering all of the evidence as to the nature of plaintiff's "trade secret", and the manner, extent, and results of its use by defendants, I conclude that the total amount of a reasonable royalty to which the plaintiff is entitled is the sum of $75,000. This amount is in addition to the $20,000 portion of the Ligasco fee. Accordingly, I find that the total profits and damages attributable to the use by defendants of the Sharp plans and economic report and study to be the sum of $95,000 and the plaintiff is entitled to judgment for that sum.

Exhibit A
Opinion of Special Master June 2, 1952.

MARVEL, Special Master.

By order of the District Court of the United States for the District of Delaware dated the 30th day of June, 1951, entered in the above entitled action it was provided:

"2. That this cause be and the same is hereby referred to Josiah Marvel, Jr., Esq., as special master, with the usual powers, to take and state an account of the profits, gains, advantages, benefits, and/or damages attributable to the use by the defendants, or either of them, of the Sharp plans, specifications and designs (Plaintiff's Exhibits 49 to 60 inclusive and Plaintiff's Ex. 22) and the theories and ideas set forth in the same, and the vessel known as the 'Natalie O. Warren.'

"3. That the plaintiff recover from the defendants the profits, gains, advantages and benefits of the defendants and/or the damages of the plaintiff attributable to the use by the defendants, or either of them, of the said Sharp plans, and the said economic study and report, and the theories and ideas set forth in the same, and the said vessel known as the 'Natalie O. Warren.' "

After the order of reference plaintiff filed certain interrogatories addressed to the defendants pursuant to Rule 33. Defendants filed a statement of account showing the gross income, the expenses, and the net income from the operations of the SS "Natalie O. Warren" for the seven months ended June 30, 1948, and for the years ending June 30, 1949, 1950 and 1951, and also filed objections to the interrogatories served by the plaintiff upon the defendants. Plaintiff then filed objections to defendants' account. Both of these matters came on for hearing before the Special Master. At that hearing the Special Master requested briefs to be filed on the question of the principle applicable in this action for

determining the amount of recovery. This request was complied with and the briefs were filed by both parties.

It is unnecessary to review the facts concerning this action as they have been clearly set forth in the opinion of the Court dated February 27, 1951. In that opinion, it was stated at pages 21–25 [99 F.Supp. 907, at page 913], as follows:

"2. There is no quarrel but that one's intellectual product will be protected by a court of equity in respect of a disclosure followed by a use when the same was obtained through a confidential relationship. Two theories have been evolved by the courts: (1) preventing unfair competition; and (2) unjust enrichment. As to the rule, Mr. Justice Holmes said: 'The word "property" as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. * * * If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.' The problem does not involve contracts, as such, although some authorities have approached the question on the theory of implied contract. Rather, it is a question of the validity and equity of a defendant's acts in receiving in confidence, pending the formulation of a contractual relationship, a disclosure of plaintiff's product. Equitable relief will not be refused simply because plaintiff's trade secret or property right was of such a nature that it might prob-

ably be discovered by an accused defendant by independent experiment. A defendant, by its own conduct, may put itself in a position where it loses the advantage of future independent experiments. And, in the case at bar, there can hardly be any serious contention but that the economic report and the Sharp plans were trade secrets, or of such novelty that the rule applies. A trade secret may consist of any formula, patent, device, plan, or compilation of information which may be used in one's business and which gives a person an opportunity over his competitor. The economic report in the case at bar is a study of the costs involved in the water transportation of LPG; its underlying contribution is to demonstrate the comparative advantage of such transportation over other methods of transportation. This report is manifestly integrated into the Sharp plans; both contemplated the conversion of vessels for maritime transportation of LPG on an economic basis. Likewise, the Sharp plans palpably constitute a trade secret. * * *"

The Court in its opinion stated:

"Then, I concluded plaintiff should be awarded the decision. The correct rule of law, as applied to the particular master facts of this case as I have found them, convinces me that plaintiff has established it is entitled to equitable relief. The proofs support the contention the economic report and the Sharp plans were trade secrets or, at least, plaintiff's proprietary interest in them should, in law and equity, be treated the same as trade secrets; disclosure was made to defendant in confidence; defendant made use of plaintiff's trade secrets in the construction of the Natalie O. Warren. Consequently, the plaintiff is entitled to equitable relief against defendant. In accordance with Rule 52, I have appended the formal findings as required."

In spite of the considerable litigation concerning the rights and liabilities following upon a disclosure of a trade secret without prior agreement for payment or use, there appears to be but little settled doctrine as to the amount of recovery. Consequently it is necessary to determine the theory which serves as the basis for permitting recovery in such cases in order to determine the measure of damages. Under varying factual circumstances three theories have been advanced in granting recovery; (1) a contract implied in fact from the circumstances of the disclosure; (2) a breach of a fiduciary obligation not to use the idea without permission, implied from receiving the disclosure in confidence and (3) unjust enrichment of the user of the idea. In this case the Court in concluding that the plaintiff is entitled to equitable relief against the defendants did so on the theory of unjust enrichment. In so ruling, the Court is amply supported by authorities. DeFilippis v. Chrysler Corporation, D.C., 53 F.Supp. 977, at page 980, affirmed 2 Cir., 159 F.2d 478, certiorari denied, 1947, 331 U.S. 848, 67 S.Ct. 1733, 91 L.Ed. 1857; Matarese v. Moore-McCormack Lines, Inc., 2 Cir., 1946, 158 F.2d 631, 170 A.L.R. 440; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1935, 80 F.2d 912, certiorari denied, 1936, 298 U.S. 673, 56 S.Ct. 938, 80 L. Ed. 1395; Mitchell Novelty Co. v. United Mfg. Co., D.C.N.D.Ill.1950, 94 F.Supp. 612. And in so doing it is clear to me that the Court recognized, what is fundamental, yet not always spelled out in decisions, that trade secret liability is based upon the wrongful taking rather than upon a property right. This must be as it is the "secret" rather than the thing to which the secret pertains which is protected. If a person comes by the trade secret independently and honestly he may use it without consent or liability. John D. Park & Sons Co. v. Hartman, 6 Cir., 1907, 153 F. 24, at page 29, 12 L.R.A.,N.S., 135, certiorari denied 212 U.S. 588, 29 S.Ct. 689, 53 L.Ed. 662. Thus the basis of the defendants' liability in this case is the tortious acquisition

and inequitable retention, and recovery is not based on the loss of a property right but on the reprehensibility of the means of acquisition. The problem then is as to the measure of the recovery. Special circumstances may affect this. In Saco-Lowell Shops v. Reynolds, 4 Cir., 1944, 141 F.2d 587 recovery was limited to royalties under a collateral licensing agreement. When the trade secret or idea is used with the consent of the submitter, recovery will be limited to reasonable royalties on a contract theory. See Dysart v. Remington Rand, Inc., D.C. Conn.1941, 40 F.Supp. 596, 599. Note 170 A.L.R. 449, 495 (1947). But here we do not have such special circumstances. There was no collateral licensing agreement and there was no consent by the plaintiff to the use of the Sharp plans and the economic report by the defendants. Under the facts of this case and under the theory of unjust enrichment, the measure of recovery here is the value of the benefit resulting to the defendants as a result of its tortious acquisition and use of the plaintiffs' "trade secret". This conclusion is contrary to that advocated by the defendants. But the error into which the defendants have fallen is based on its theory that the liability of the defendants arises from the taking of plaintiffs' property. From there they argue that damages then should be limited to the reasonable value of the property taken. As pointed out above, this is a mistaken theory as to the liability imposed on the defendants as a result of their acts. The obligation arising out of the wrongful taking is to restore to the plaintiff the benefit received, and it is the value of the benefit to the defendants that is the measure of the plaintiff's recovery.

Having reached this conclusion, there is the matter of the procedure to be followed in this action. It appears to me that this action has in substance been presented to the Court in two phases: First, the phase to determine whether the facts entitle the plaintiff to equitable relief and if so, then the second phase to determine the measure and amount of

178

recovery. The first phase has been determined by the Court. By its order of reference the Court has, in substance, substituted a Special Master for the Court to hear and determine the second phase of this action. In this second phase, I conclude that orderly procedure requires that the plaintiff proceed to present his case as to the damages to which he is entitled and that all means of discovery provided by the Federal Rules of Civil Procedure, rule 26 et seq., 28 U.S.C. are available to it.